No. 42,633

CHARLES B. WILLIAMS and BARBARA WILLIAMS, *Appellants*, v. DR. FRANK L. MENEHAN, DR. C. T. HAGAN and DR. RAY T. PARMLEY, *Appellees*.

(379 P. 2d 292)

Opinion filed March 2, 1963.

*C. H. Morris*, of Wichita, argued the cause, and *Robert F. Bailey*, of Wichita, and *David W. Kester*, of Eureka, were with him on the briefs for the appellants.

*Robert C. Foulston* of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard* and *Charles J. Woodin*, and *Paul H. White*, all of Wichita, were with him on the briefs for the appellee, Dr. Frank L. Menehan.

*William Tinker*, of Wichita, argued the cause, and *Arthur W. Skaer, Hugh P. Quinn, Alvin D. Herrington, Richard T. Foster* and *Lee Woodard*, of Wichita, were with him on the briefs for the appellees, Dr. C. T. Hagan and Dr. Ray T. Parmley.

The opinion of the court was delivered by

WERTZ, J.: This is an action by the surviving parents, Charles B. and Barbara Williams, plaintiffs (appellants), for the wrongful death of their minor son, Mark Lee Williams. The action is founded upon alleged malpractice and is brought against the defendant doctors who interposed demurrers to the plaintiffs' evidence, which the trial court sustained. This appeal is taken only from the judgment of the court sustaining the demurrers of the defendants (appellees) Drs. Frank L. Menehan, C. T. Hagan and Ray T. Parmley.

The sole question to be determined by this court is whether or not under the plaintiffs' evidence the defendant doctors disclosed to the plaintiffs sufficient information about the diagnostic procedure to constitute informed consent.

A summary of the facts is as follows:

When not quite three years of age a congenital heart condition became apparent in Mark, the child showing some blueness around

the lips and lassitude following exercise. His mother took him to their family physician in Eureka, Dr. Robert L. Obourn, who examined the child but found nothing especially wrong with him, but because of the history of blueness around the lips recommended the child be examined by Dr. Frank L. Menehan of Wichita, a well-known pediatrician.

On November 23, 1956, at the request of Dr. Obourn and the plaintiffs, Dr. Menehan examined Mark and made a diagnosis of a possible congenital cardiac defect and recommended the child be subjected to a further diagnosis, known as a cardiac catheterization, to be performed by a team of medical doctors to be arranged for by the defendant Menehan.

The mother specifically inquired of Dr. Menehan if the proposed cardiac catheterization procedure involved any risk or danger to the child. Dr. Menehan replied to her that a team of doctors performed the catheterization and they had not had any trouble.

The mother made no decision at that time upon Dr. Menehan's recommendations but returned home to talk it over with the child's father, and a few days later Dr. Menehan called plaintiffs and informed them he had made arrangements for the medical team to do the catheterization on December 6, 1956.

Two days prior to the scheduled operation plaintiffs brought Mark to the hospital where, for the first time, the father met Dr. Menehan. The father had no knowledge concerning the cardiac catheterization procedure, or the risk of injury or death, if any, to the child. He specifically asked Dr. Menehan about this and the doctor described in a general way the procedure, and assured the father that the medical team he had chosen had done numerous cardiac catheterizations, and there should be no problem. Dr. Menehan further advised the plaintiffs that Dr. C. T. Hagan would be in charge of the procedure; that he was an experienced doctor specializing in cardiac catheterizations; and that he would contact the plaintiffs before the catheterization and explain it to them.

On December 5, Dr. Hagan talked with the father, and when the father asked him if there was any risk to the child involved in doing the heart catheterization, Dr. Hagan replied, "Absolutely none. We do these tests on grown-ups and we do them with local anesthetics. We don't even put them asleep but on your boy we will put him asleep and he won't know anything about it."

On the morning of December 6, about 6:30 o'clock, Dr. Glen Eaton, an associate and agent of defendant Dr. Ray T. Parmley,

administered to Mark 500 milligrams of sodium pentothal as an anesthetic. After it had taken effect, Mark was taken to the laboratory for the performance of the cardiac catheterization. During the catheterization of Mark he awakened and started struggling and 100 milligrams of sodium pentothal were injected into the blood stream through the heart catheter. Withing twenty seconds after this injection Mark's heart rate slowed considerably, his blood pressure was not obtainable, his pulse was barely perceptible, he was given oxygen and cardiac massage was instituted, normal rhythm could not be established, and Mark was pronounced dead at 10:00 a.m.

Plaintiffs contend that the defendant doctors failed in their duty to disclose to them, as parents of Mark, the risks involved in the cardiac catheterization; that the consent they gave to the performance of said medical procedure was not an informed consent; that their evidence so sustains their claim; and that under the law and the evidence the trial court committed reversible error in sustaining the demurrers of the defendants.

At the outset it may be stated that all of the parties rely on our recent case of *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, rehearing denied 187 Kan. 186, 354 P. 2d 670, the parties seeking to place a different construction on what was said with reference to informed consent. We said in the *Natanson* case at page 406 it is the duty of a doctor to make a reasonable disclosure to his patient of the nature and probable consequences of the suggested or recommended treatment, and to make a reasonable disclosure of the dangers within his knowledge which are incident or possible in the treatment he proposes to administer. But this does not mean that a doctor is under an obligation to describe in detail all of the possible consequences of treatment. To make a complete disclosure of all facts, diagnoses and alternatives or possibilities which might occur to the doctor could so alarm the patient that it would, in fact, constitute bad medical practice.

Further, on pages 409-410, we said the duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. How the physician may best discharge his obligation to the patient in this difficult situation involves primarily a question of medical judgment. So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible

courses should not be called into question if it appears, all circumstances considered, that the physician was motivated only by the patient's best therapeutic interests and he proceeded as competent medical men would have done in a similar situation.

In view of the mentioned rules set forth in *Natanson v. Kline,* supra, we are of the opinion that under the evidence the three defendant doctors made a reasonable disclosure of the nature and consequences of the proposed treatment.

The record in this case discloses that the mother of the child took him to their family physician in Eureka, Dr. Obourn, who in turn recommended the child be examined by Dr. Menehan. Dr. Menehan subsequently examined the child and determined the boy's heart was enlarged and that some cardiac difficulty was present. As an aid to further diagnosis, Dr. Menehan advised the parents Mark should be placed in a hospital where a cardiac catheterization could be performed, a procedure in which a catheter is passed through a vein in the patient's left arm and advanced through the venous system into the heart and then into the pulmonary artery, the purpose being to reveal pressures and other conditions within the heart itself, the catheter being connected to monitoring equipment that records the pressure and other conditions within the heart that are essential aids to the diagnosing physician. Dr. Menehan discussed this procedure, explained its necessity to the mother, who in turn discussed it with the father, and Dr. Menehan further advised the parents that this was a routine diagnostic procedure, not uncommon, and involved no danger of risk or injury to Mark.

Dr. Menehan also advised Dr. Obourn, the parents' doctor at Eureka, of his diagnosis, and subsequently the parents talked to Dr. Obourn.

Dr. Menehan also advised the parents that there was only one team of physicians in Wichita who performed cardiac catheterizations, *i. e.,* Dr. Hagan, a heart specialist, and Dr. Parmley, an anesthesiologist, who were members of this team.

It was further explained to the parents immobility of the patient is essential because of the fact the passing of the catheter into the heart itself can produce injury to the patient and the valves of his heart if there is any jerking or sudden movement on the part of the patient. Thus, with a small child unconsciousness must be induced by anesthetic, and in this case sodium pentothal was decided upon.

Dr. Menehan also advised the parents that this team had performed some 100 of these catheterizations without any bad results.

Relying upon Dr. Menehan's statement, the parents employed Dr. Hagan to perform the cardiac catheterization. The day before the operation Dr. Hagan talked to the father of the child and advised him that there was absolutely no danger in the operation.

The parents testified that they realized that there was some danger in any operation. The father testified, "I knew when you went to a hospital and when you cut into a vein and put a tube in there it involved some risk," and further, that he knew there was some risk involved in this procedure. The mother testified that both she and her husband had a fair understanding of what the procedure was. She further testified that when she talked to Dr. Hagan in the afternoon the child was admitted to the hospital that he didn't say there was no hazard, he said they do three or four a month and they never had encountered any trouble.

Dr. Parmley testified there was some risk in the use of sodium pentothal.

Notwithstanding the complete disclosure on the part of the defendant doctors, plaintiffs offered no evidence of what a reasonable physician would do under like and similar circumstances, no evidence it was wrong for Dr. Menehan to call for a cardiac catheterization, no evidence it was medical error to do this diagnostic procedure or that the manner in which it was performed was error, nor any evidence the choice of anesthetic or the amount administered was erroneous. The evidence clearly shows that plaintiffs were informed of the nature of the procedure and of the things the doctors were undertaking to do. They had the facts upon which to base their decision, and we are of the opinion the parents were fully informed. The record is devoid of any standard of care required of the defendant doctors, much less any violation of such standards, known or unknown.

The evidence introduced by the plaintiffs was wholly insufficient to establish a case of liability against any of the defendants. It also was insufficient to permit a jury to speculate as to what the defendants should or should not have done.

The facts in this case are unlike the facts in the *Natanson* case. There Dr. Kline made no disclosure whatsoever, and the treatment was new and very dangerous; while in the instant case Dr. Menehan advised plaintiffs of the procedure sufficiently to con-

stitute an informed consent. There was no evidence of this operation being extremely hazardous; no evidence of any death resulting from such an operation or any malpractice in performing the exploratory treatment. No evidence of fault or breach of proper medical standards was established against the defendant doctors. There is nothing in this action to detract from the rules of law laid down in the *Natanson* case.

A diligent examination of the record reveals it is devoid of a factual issue to submit to the jury. Therefore, the judgment of the trial court is affirmed.