No. 45,630

Nancy D. Younts, a Minor, by and Through Her Mother, Natural Guardian and Next of Kin, Ethel M. Johnson, *Appellant,* v. St. Francis Hospital and School of Nursing, Inc., *Appellee.*

(469 P. 2d 330)

Opinion filed May 9, 1970.

*Richard H. Rumsey,* of Wichita, argued the cause and was on the brief for appellant.

*Lawrence McDonough,* of Jochems, Sargent & Blaes, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

FROMME, J.: This claim was filed by Ethel M. Johnson, mother, on behalf of Nancy D. Younts, her seventeen year old daughter, against the St. Francis Hospital and School of Nursing, Inc. (the hospital) for injury and damage to the tip of the daughter's right ring finger. The claim was tried to the court. Judgment was rendered in favor of the defendant based upon the court's findings. The plaintiff has appealed.

The claim was presented to the court on two theories. First, on the theory that one of the nurses employed by the hospital negligently caused the injury by closing a door on the daughter's finger, and second, on the theory that a resident surgeon employed by the hospital · performed an unauthorized surgical procedure on the daughter to repair the finger without obtaining the consent of the daughter and her mother.

We will treat the contentions with respect to each separate theory in the order listed above.

The facts as to the accident are in dispute. In view of the court's findings in favor of the hospital the evidence favorable to the hospital will be summarized.

The mother had undergone major surgery on the day of the daughter's injury. The daughter was in the hospital and was concerned about her mother's condition. The mother was brought to her room on a surgical cart while the daughter waited outside her mother's room. The daughter followed the nurses into her mother's room. The nurses were preparing to transfer the mother from the surgical cart to the bed. The daughter was asked to step into the hall. When the daughter was in the hall one of the nurses (Wanda) closed the door to the room. She heard the daughter scream with pain. In a partial closing of the door the nurses's view of the daughter had been obscured by the door. The nurse could not anticipate and did not see the daughter's move toward the door. It may be inferred the daughter stepped forward after the door was

partially closed and unconsciously placed her finger in the scissor-like action of the door hinge. A piece of flesh from the daughter's finger was found on the floor below the hinges of the door. The door was opened immediately for the nurse had not yet released the door handle. The daughter was suffering and her finger was bleeding. One of the nurses (Joyce) asked the daughter if she would like to go see about getting her finger fixed. The daughter said she would. The nurse obtained permission at the nurses' station to take the daughter to the emergency room of the hospital. The resident surgeon in the hospital treated and repaired her finger.

The court made the following findings with regard to negligence of the hospital employees:

"1. The injury sustained by the plaintiff, Nancy D. Younts, was not due to any wrongful or negligent act on the part of St. Francis Hospital and School of Nursing, Inc., its agents, servants or employees.

"2. The injury sustained by the plaintiff, Nancy D. Younts, to her finger was not due to the failure of any care due plaintiff by defendants, its agents, servants or employees."

The judgment of the court denied plaintiff relief.

Upon appellate review this court accepts as true the evidence and all inferences to be drawn therefrom which tend to support the findings of the trial court. The appellate court disregards any conflicting evidence and inferences which do not tend to support the findings. When findings are attacked for insufficiency of evidence or as being contrary to the evidence the appellate court's power begins and ends with determining whether there is evidence to support such findings. It is of no consequence that contrary evidence was adduced which, if believed, would have supported different findings. In short, the findings of a trial court as to negligence or the lack of it which are supported by substantial relevant evidence will not be overturned on appellate review (*Morris v. Hoesch*, 204 Kan. 735, 466 P. 2d 272; *In re Estate of Bernatzki*, 204 Kan. 131, 460 P. 2d 527.)

Plaintiff's claim based on the theory that one of the nurses employed by the hospital negligently caused the injury by closing a door on the daughter's finger is disposed of by the findings of the trial court. The findings are supported by substantial competent evidence and will not be overturned on appeal.

It should be noted at this point that a malpractice claim based upon negligence in the care and treatment of a patient is not concerned with consent of the patient. The consent of a patient or of

his parent is immaterial in such a case because a consent does not free the hospital or the doctor from the consequences of negligence. (See *Tefft v. Wilcox*, 6 Kan. 46; *Hershey v. Peake*, 115 Kan. 562, 223 Pac. 1113; *Travis v. Bishoff*, 143 Kan. 283, 54 P. 2d 955; *Riggs v. Gouldner*, 150 Kan. 727, 96 P. 2d 694; *Zink v. Basham*, 164 Kan. 456, 190 P. 2d 203.)

See also *Joy v. Brown*, 173 Kan. 833, 252 P. 2d 889, *Richey v. Darling*, 183 Kan. 642, 331 P. 2d 281, and *Kimberly v. Ledbetter*, 183 Kan. 644, 331 P. 2d 307, where recoveries were authorized despite consent when abortions were negligently performed.

The article by William A. Kelly, associate professor of law at the University of Kansas School of Law, entitled "The Physician, The Patient, And The Consent" points out that consent, or the lack of it, is immaterial in malpractice claims based upon negligence. (8 Kan. L. Rev. 405 at pp. 426, 427)

An examination of plaintiff's claim and of the evidence introduced during the trial indicates no attempt was made to establish that Dr. Winsky, the treating physician, was negligent in his care or treatment of this injury.

We turn now to plaintiff's second theory, that Dr. Winsky performed an unauthorized surgical procedure on the daughter without obtaining the consent of the daughter and her mother. In addition the plaintiff contends the consent of the daughter cannot be sufficient because the docter failed to adequately inform the daughter as to the consequences of this surgical procedure.

It will be helpful to examine some additional facts bearing upon the question. The injury occurred in the hospital at a time when the mother was semi-conscious by reason of a general anaesthetic. She was being returned to her room after major surgery. The injured daughter's parents were divorced. The father was living two hundred miles away. His address was unknown and not immediately available. The daughter was seventeen years old, intelligent and capable for her age. The injury resulted in loss of the fleshy tip of her right ring finger. The fingernail was left intact and the end of the bone was slightly fractured. The surgical repair, accomplished in the emergency room of the hospital, was of a minor nature. The plaintiff remained conscious throughout the treatment and was fully aware of what was being done. She raised no objection to the surgical procedure. The testimony of both the family doctor and the treating physician indicates the medical procedure utilized in the repair was necessary and customary for

that particular injury. The functional and cosmetic results attained were good. The family doctor, who was consulted before the repair was undertaken, gave his consent. He indicated to the treating physician that the surgical procedure suggested was proper, necessary and should be undertaken.

The family physician, Dr. Thompson, testified in part as follows:

"On the date of the incident, January 27, 1965, Dr. Winsky called me. I do not remember what time of day. I was in my office when he called. He described the injury and outlined the plan of treatment which sounded good to me, so I instructed him to proceed and do it. I leave a standing order at St. Francis Hospital with respect to treatment of patients of mine who present themselves for emergency care, at least those that are there for minor injuries. My orders are for them to go ahead and repair them if it is minor such as a laceration or such as this which would be a minor procedure. And Dr. Winsky cousulted me."

. . . . . . . . . . . . . .

"I have been Nancy Younts' physician for several years prior to this occurrence. . . ."

. . . . . . . . . . . . . .

"I think the operation was well done. I think the graft took well. . . ."

. . . . . . . . . . . . . .

"Miss Younts was in my office five days ago. There was no complaint at that time about the finger. She wasn't in for that anyway. I don't believe that I have an opinion to a reasonable degree of medical certainty as to whether *in* [sic] the injury or damage was occasioned or suffered by Miss Younts as a result of the alleged lack of parental consent or any other consent. The reason I say that is that she has a good functional result of the finger. I think almost perfect as a matter of fact. I don't believe the lack of consent had anything to do with the end result, if there was such a lack of consent. If this procedure had not been undertaken to stitch on a small piece of skin onto the finger tip, I think this would have healed over a period of time. I think these can be left out in the open and will heal. They'll heal faster this way and will probably heal with a scar on the end rather than probably the good result she has here now. I have not performed *sensitivity tests* on the finger tip; that's all subjective actually that we have as far as the sensitivity is concerned. By subjective, I mean what she says. I think the function of the finger now should be good. I have no knowledge of the portion of the finger tip which was torn off. In order for me to form an opinion as to whether or not it was us*u*able [sic]. I would have had to have an opportunity to examine it. The reason a graft is ordinarily taken from the forearm on injuries of this kind is primarily because the skin there will have about the same type pigment as you have in the hand. If you take it off some place else that is covered and you put it out here, it'll turn dark. If you take it off the hip and put it on the finger, you will have a finger with a brown end on it. The skin from this area will have about the same pigment as the skin out here. One purpose is for aesthetic qualities. . . ."

. . . . . . . . . . . . . .

". . . I don't know if there are any other places than the forearm to take the skin for this type of operation. I know this is the customary place to take it. I suppose there are other places. I have operated and taken it off the skin for [sic] the forearm, but that was a bigger area."

## Dr. Winsky, the treating physician, testified as follows:

"Later on the same day, I saw her in the emergency room. This was after lunch some time, probably between two and three o'clock. This is as close as I can recall. I was called down to the emergency room. I was the surgery resident on call that day. I was called down there to examine and repair this finger tip. I examined the finger at the time I arrived. There was also an x-ray there that had been taken of her finger before I arrived which demonstrated a small fracture in the tip of the bone of this last phalanx of the distal phalanx. The fracture was just on a small edge of the tuft. The tuft is the flared portion on the very end of the phalanx. It is real friable, somewhat fragile piece of bone. It's not a solid structure like the rest of it. There was a crack through this that was visualized on x-ray. A crack is a fracture. As I recall, the tip of her finger was missing. I did't see any bone exposed. There was soft tissue there, but the entire skin was missing. The finger nail was still there. This was below the finger nail or the actual distal or past the finger nail. The finger nail was not affected. I don't recall the specific conversation, but I know vaguely what conversation went on. I recall having told her what she already knew, that her finger tip was missing and that we would have to take a piece of skin, best from the arm, to put over this to cover it. She did not have any objection to this procedure as far as I recall. Before I commenced treatment of the finger, I talked to Dr. Dan Thompson. I called him at his office. I described what I have just described about her finger, told him what had happened or what I knew about it and told him what I though ought to be done, and he said do it. So I did. I took a small eliptical piece of skin from her forearm, and after I had taken it off, I reapproximated the edges where I had taken the skin from. I closed this, and then I took the little piece of skin very carefully with the scissors, took the fat off the back side so it has a better chance of growing, and cut it to the proper shape and sutured it to the tip of her finger. During the time I was stitching the skin on, I am sure I had conversation with Nancy concerning what I was doing. I don't remember specifically, but I talk a lot and I usually talk to people while I am working, and I almost invariably tell them, before you stick them with the needle, before you deaden the finger, 'This will hurt.' These are rather non-specifics, but this has always been my policy. I don't have a clue as to how many stitches it took to sew the tip of the finger on. The purpose in taking the skin from the wrist and putting it on the finger tip is that you have to have some kind of a covering on the finger tip or else you get infection or you get granulation. It piles up and forms an excessive amount of scar tissue which is extremely sensitive. It doesn't heal well unless you get a covering on it. The reason for taking it from the wrist, it more nearly matches the finger than any other place. This is pretty standard procedure concerning the place to get grafts for the finger. . . ."

Mrs. Johnson, the mother, testified on cross-examination as follows:

"Dr. Thompson is our family doctor. Nancy has gone to Dr. Thompson. I have confidence in him. Had I known at the time that Dr. Thompson and Dr. Winsky had conferred and decided that this was the best procedure, I doubt if I would have consented for the graft to come from her arm. If Dr. Thompson and Dr. Winsky had indicated that they felt that that was the best procedure, I would have taken some time with Dr. Thompson to talk and find out if it was the best. If he had told me it was the best, I would have consented if he said so and she was agreeable."

The trial court's findings, which relate to plaintiff's theory that the medical procedure performed on plaintiff was unauthorized and without the consent of the daughter and her mother, were as follows:

"4. This Court finds that at the time of the accident and injury to plaintiff's finger and all during the time plaintiff was in the emergency room of defendant's hospital, plaintiff was conscious and capable of knowing what was taking place. Plaintiff was a young lady of 17 years on the date of this incident.

"5. This Court further finds that at no time did plaintiff object or complaint [sic] to anything anyone did to assist her. There is no evidence in this case that plaintiff did not know and observe at all times what the doctor was doing to repair her finger. There is no evidence that plaintiff at any time objected to any action taken by the doctor or hospital personnel.

"6. This Court finds that, based on the evidence presented, plaintiff suffers no disability or damage as a result of the injury to her finger or the treatment given her finger."

Plaintiff contends these findings are erroneous as a matter of law and do not support a judgment in favor of defendant.

It is the settled general rule that in the absence of an emergency or unanticipated conditions arising during surgery a physician or surgeon before treating or operating must obtain the consent of the patient, or if the patient is incompetent the consent must be obtained from someone legally authorized to give it for him. A surgical operation on the body of a person is a technical battery or trespass, regardless of its result, unlesss the person or some authorized person consents to it. Generally the surgeon is liable for damages if the operation is unauthorized. (41 Am. Jur., Physicians and Surgeons, § 108, p. 220; 70 C. J. S. Physician and Surgeons, § 48 g, p. 967.)

See annotations on the subject of consent to surgical operations appearing in 76 A. L. R. 562 and in 139 A. L. R. 1370.

The consent of a patient to be sufficient for the purpose of authorizing a particular surgical procedure must be an informed

consent. The patient must have reasonable knowledge of the nature of the surgery and some understanding of the risks involved and the possible results to be anticipated.

In *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, this court said:

"In our opinion the proper rule of law to determine whether a patient has given an intelligent consent to a proposed form of treatment by a physician was stated and applied in *Salgo v. Leland Stanford, Etc. Bd. Trustees*, supra [154 Cal. App. 2d 560, 317 P. 2d 170]. This rule in effect compels disclosure by the physician in order to assure that an informed consent of the patient is obtained. The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances. . . ." (p. 409)

The medical treatment in that case was a technical cobalt radiation treatment of a serious and dangerous nature where the risks and hazards of the treatment endanger life and must be weighed against the need of the particular patient.

It was also stated in *Natanson:*

"The conclusion to be drawn from the foregoing cases is that where the physician or surgeon has affirmatively misrepresented the nature of the operation or has failed to point out the probable consequences of the course of treatment, he may be subjected to a claim of unauthorized treatment. But this does not mean that a doctor is under an obligation to describe in detail all the possible consequences of treatment. . . ." (p. 406)

". . . Under the rule heretofore stated, where the patient fully appreciates the danger involved, the failure of a physician in his duty to make a reasonable disclosure to the patient would have no causal relation to the injury. In such event the consent of the patient to the proposed treatment is an informed consent. The burden of proof rests throughout the trial of the case upon the patient who seeks to recover in a malpractice action for her injury." (p. 410)

In the opinion denying a rehearing in *Natanson v. Kline*, supra, reported at 187 Kan. 186, 354 P. 2d 670, it is pointed out that what is a reasonable disclosure upon which an informed consent may rest must depend upon the facts and circumstances of each case.

See also *Williams v. Menehan*, 191 Kan. 6, 379 P. 2d 292, where it was held the physician made a reasonable disclosure as to a cardiac catheterization procedure which resulted in the death of the patient.

In *Yeates v. Harms*, 193 Kan. 320, 393 P. 2d 982, which involved the loss of an eye after a cataract operation, this court said:

"A careful examination of plaintiff's requested instructions reveals that in his concept of the case he goes too far and would have this court extend the

duty of a physician or surgeon to the extreme where he would have to apprise his patient not only of the known risks but also of each infinitesimal, imaginative, or speculative element that would go into making up such risks. This is another hurdle we simply cannot make. . . ." (p. 333)

In the present case we are confronted with an additional question of whether a seventeen year old girl can give her consent to a minor surgical procedure without the knowledge or consent of her parents. We find no Kansas cases on the subject.

In *Lacey v. Laird*, 166 Ohio St. 12, 139 N. E. 2d 25, where plastic surgery was performed on the nose of an eighteen year old girl without her parents' consent, it was pointed out:

"The making of a contract obviously involves the consent of each of the contracting parties. Probably because of this and of the law with respect to the capacity of infants to contract, some authorities have indicated that the consent of a minor to performance of a surgical operation will ordinarily not be sufficient in itself to require the conclusion that performance of such operation cannot constitute an assault.

"It is apparent however that the consent, which prevents what would otherwise be an assault from being an assault, does not depend upon the capacity of the consenting party to contract. It has nothing to do with contractual capacity." (pp. 22, 23)

It is stated in the concurring opinion in *Lacey v. Laird*, supra, that although an infant may avoid liability on contracts solely because of his age, the general rule as to torts does not allow an infant to escape the consequences of his informed consent if he has the degree of maturity of mind which permits him to understand the intricacies of the matter.

A majority of the cases collected in 76 A. L. R. 562 and 139 A. L. R. 1370 recognizes that the consent of a parent may not be necessary or required under circumstances where the child has knowingly consented. In such cases the sufficiency of a minor's consent depends upon his ability to understand and comprehend the nature of the surgical procedure, the risks involved and the probability of attaining the desired results in the light of the circumstances which attend.

In *Bonner v. Moran*, 126 F. 2d 121, 139 A. L. R. 1366, a fifteen year old boy consented and became the donor in an extensive skin graft procedure for the benefit of another person who was seriously burned. The procedure required the boy to remain in the hospital for two months. The case holds generally the consent of a parent to a surgical operation on a child is necessary. Certain

exceptions are recognized in the opinion and those exceptions generally recognized by the courts are, (1) when an emergency exists, (2) when the child has been emancipated, (3) when the parents are so remote as to make it impracticable to obtain consent in time to accomplish proper results and (4) when the child is close to maturity and knowingly gives an informed consent. The opinion stresses that one of the basic considerations to be taken into account is whether the proposed operation is for the benefit of the child and performed with a purpose of saving his life or limb.

In our opinion the proper rules of law were set forth and applied in *Bonner*.

Applying those rules of law to the facts and circumstances of the present case it appears that the father's consent was not available or necessary. The mother's consent was not obtained but her physical condition at the time would have necessitated delaying necessary treatment of a painful injury. The mother's testimony at the trial indicates that if she had been asked for her consent she would have relied largely upon the judgment of her family doctor. This doctor was consulted by the treating physician in advance and he approved the surgical procedure adopted, including the "pinch graft" taken from the girl's forearm. The plaintiff was conscious throughout the treatment and indicated her consent both verbally and by submitting herself to the treatment. She was of sufficient age and maturity to know and understand the nature and consequences of the "pinch graft" utilized in the repair of her finger. It is uncontradicted that the method of repair utilized was the approved surgical treatment and in the best interests of the patient. The desired results were accomplished and permanent damage resulting from the injury after the treatment was minimal from both a functional and a cosmetic standpoint.

We hold that the facts and circumstances attending the injury and repair of the plaintiff's finger bring this case within an exception to the general rule requiring the consent of the parent to a surgical operation on a child. The exception applicable is that under the circumstances the daughter was mature enough to understand the nature and consequences and to knowingly consent to the beneficial surgical procedure made necessary by the accident.

The findings of the trial court in this regard are supported by

substantial competent evidence and include a finding that the plaintiff suffers no disability or damage to her finger as a result of the treatment.

The judgment is affirmed.