No. 81,197

ELY BARTAL, M.D., *Appellant,* v. LEANN BROWER, BRUCE BROWER, BRADLEY J. PROCHASKA, and GERARD C. SCOTT, *Appellees.*

(993 P.2d 629)

Opinion filed November 12, 1999.

*Brian G. Grace,* of Grace, Unruh & Pratt, of Wichita, argued the cause, and *Gilbert L. Guthrie* and *Sharon A. Werner,* of the same firm, were with him on the briefs for appellant.

*Nicholas S. Daily,* of Depew and Gillen, L.L.C., of Wichita, argued the cause and was on the brief for appellees Leann and Bruce Brower.

*Darrell L. Warta,* of Foulston & Siefkin, LLP, of Wichita, argued the cause, and *Mark A. Biberstein,* of the same firm, was with him on the brief for appellee Bradley J. Prochaska.

*Lynn R. Johnson,* of Shamberg, Johnson & Bergman, Chartered, of Overland Park, argued the cause, and *Steven G. Brown,* of the same firm, was with him on the brief for appellee Gerard C. Scott.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Ely Bartal, M.D., brought this malicious prosecution action against Leann and Bruce Brower, the parents of a young patient who sued him for medical negligence, and the attorneys who represented the plaintiffs in that action, Bradley J. Prochaska and Gerard C. Scott. The district court entered summary judgment in favor of defendants, and Bartal appealed. The case was transferred by this court from the Court of Appeals pursuant to K.S.A. 20-3018.

Dr. Bartal alleged that Prochaska and Scott represented the Browers in filing a malpractice suit against him in which it was alleged that as a result of his negligent surgery, Maria Brower suffered paralysis. Bartal further alleged that at the time the suit was filed against him, "[i]t was known that Dr. Bartal did not perform the neurosurgical procedure that allegedly caused injury to Maria." Moreover, defendants knew or should have known "that Dr. Shapiro performed the neurosurgical procedures at issue." Thus, according to Bartal's pleading, "[t]he defendants instituted the malpractice suit against Dr. Bartal without probable cause, and with malice."

All defendants denied knowing that Dr. Bartal did not cause the injury to Maria.

In July 1997, the trial court entered summary judgment in favor of the Browers. In the journal entry, the trial court made findings of "the following uncontroverted facts":

"1. On October 28, 1987, Dr. Ely Bartal and Dr. William Shapiro performed back surgery on Maria E. Brower, a minor.

"2. During the course of this surgery, Maria was rendered paraplegic, necessitating the constant use of leg braces for ambulation. She is incontinent of both bowel and bladder.

"3. When Maria's condition did not improve subsequent to surgery, Mr. and Mrs. Brower sought legal advice as to whether a claim should be made on behalf of their daughter against any doctors who were involved in their daughter's surgery.

"4. The Browers were referred to Brad Prochaska, an attorney whose practice is concentrated in medical malpractice.

"5. Mr. Prochaska has practiced law in Kansas for sixteen years. For the past few years, Mr. Prochaska's practice has had a special concentration in handling medical malpractice cases. At present, 80%-90% of his practice consists of medical malpractice. In conjunction with his colleague, Mr. Scott, Mr. Prochaska has handled to a conclusion over fifty medical malpractice cases. He has had some notable successes, including a six million dollar medical malpractice verdict.

"6. Mr. Prochaska told the Browers about his experience and success in the medical malpractice field.

"7. The Browers had no medical training and no experience with medical malpractice cases. Mrs. Brower is a housewife. Mr. Brower works as a corrections officer at the Hutchinson Correctional Institute.

"8. During the course of oral argument, plaintiff's counsel acknowledged that prior to filing suit against Dr. Bartal, Mr. Prochaska and Mr. Scott obtained copies

of all of Maria Brower's medical records pertaining to the particular procedure at issue.

"9. In deciding to file the lawsuit against Dr. Bartal, Mr. Prochaska relied primarily on the medical records and what his experts had to say. What he learned from the Browers simply confirmed what he learned from the records and the experts.

"10. Subsequently, the Browers relied on Mr. Prochaska's advice in dismissing the claim against Dr. Bartal. The decision to dismiss Dr. Bartal was based on litigation strategy which Mr. Prochaska had successfully utilized in prior medical negligence litigation. The Browers had reservations about Mr. Prochaska's recommendation to dismiss Bartal, but followed his advice. Despite occasional differences of opinion, Mr. Prochaska could think of no instance in the handling of the Brower suit where the Browers did not rely upon and follow his advice.

"11. The Browers relied on Mr. Prochaska's advice that a lawsuit should be filed against Dr. Bartal. If Mr. Prochaska had informed the Browers that there was no claim to be made against Dr. Bartal, then no claim would have been filed."

Based on these uncontroverted facts, the trial court concluded that the Browers were entitled to judgment as a matter of law in that they relied upon the advice of counsel in filing the medical malpractice action against Bartal. The trial court denied Bartal's motion for reconsideration. Bartal first contends the trial court erred in granting summary judgment to the Browers.

For the Browers, as litigants, the advice of counsel in initiating a civil action is a complete defense to malicious prosecution. The defense is conditioned on the litigants' having fully disclosed to the attorney all material facts within their knowledge and which could have been learned with diligent effort. *Hunt v. Dresie*, 241 Kan. 647, Syl. ¶ 7, 740 P.2d 1046 (1987).

In ruling on the Browers' motion for summary judgment, the district court made findings of fact. As noted by Bartal's counsel at the time of the ruling and in a motion to reconsider it, the district court did not make a finding that the Browers fully disclosed all material facts. Bartal contends that the trial court's failure to make a finding on this essential element of the defense of advice of counsel led to an erroneous entry of summary judgment. He contends that the Browers did not disclose to the attorneys all they knew about their daughter's medical treatment. What Bartal contends was not disclosed is that the Browers had a conversation with Dr. Ronald Williams, the resident physician, about the upcoming sur-

gery in which they learned that Shapiro would have an active part in the surgery.

"A material fact is one on which the controversy may be determined." *Ebert v. Mussett*, 214 Kan. 62, 65, 519 P.2d 687 (1974). It is undisputed and the district court made a finding that Prochaska and Scott obtained copies of all pertinent medical records before filing suit. The surgery report identifies the surgeons as "Dr. E. Bartal/Dr. W. Shapiro." Even if Prochaska and Scott had not learned from the Browers about Shapiro's involvement in the surgery, they would have become aware of that fact from the medical records. Thus, if the Browers failed to tell their attorneys about a conversation with Williams in which they learned that Dr. Shapiro would be involved in the surgery, the omission is immaterial to the outcome of this controversy. Moreover, it reasonably could be inferred from Prochaska's testimony that what he learned from the medical records confirmed what the Browers had told him of Shapiro's involvement.

Bartal is vague about how the information in question might be material to the Browers' action against him. What he seems to imply is that knowing of Shapiro's involvement in the surgery would cause the attorneys to advise the Browers against suing Bartal. It does not appear from the record, however, that Prochaska and Scott were unaware of Shapiro's role when they filed suit against Bartal, nor would it be material to their decision to file the suit against Bartal.

In conjunction with the disclosure question, Bartal maintains that the Browers failed to conduct the investigation required of them. He seems to have in mind additional questions the Browers could or should have asked when they tape recorded telephone conversations with the surgeons. According to Bartal, the Browers should have asked which doctor performed what parts of the surgical procedure, but they failed to do so. Knowing what questions to ask about serious medical conditions and remedies requires greater knowledge and sophistication than a layperson possesses. For this reason, we conclude that Bartal would require more of the litigants than the court's phrase "diligent effort" was meant to

encompass. We find no error in the trial court's entry of summary judgment for the Browers.

Bartal next argues the trial court improperly granted summary judgment to Prochaska and Scott in January 1998. The ruling made on the record was incorporated by reference into the journal entry. In pertinent part, the trial court stated on the record:

"With respect to lack of informed consent, although I agree that Dr. Bartal should not give or could not—I shouldn't say could not—should not have given the information and talked with the parents, the Browers, about the LL—LMM surgery, he has an affirmative obligation to see that it gets done or had an affirmative obligation to see that it got done and he didn't. He made an assumption that was incorrect. And, therefore, there was probable cause to file suit against him on that basis.

"And I—just for clarification—I'm—this case really gets murky because everybody—and, when I say everybody, I mean everybody talks about the reports and the depositions that were taken after suit was filed and after suit was dismissed and after this suit was filed, but the real point on probable cause to file the suit exists at the time it was filed and what was known and in that—at that point in time, it's undisputed that Mr. Prochaska—and I'm gonna say Prochaska, when technically it's really Prochaska and Scott—had the medical records, he had reports from a number of doctors, and in particular Dr. Boggan, . . . Dr. van Dam, the third one—

"MR. WARTA: Lubicky.

"THE COURT: Thank you. Those would give any reasonably prudent plaintiff's medical negligence attorney basis to believe that there was a cause of action against Dr. Bartal based on what's in those reports and what's in those records, for medical negligence in addition to no informed consent.

"And I know there's a lot of other stuff that—well, I'm not gonna get into whether he should have been sued or not and whether they could have prevailed against him if they hadn't dismissed. But there's certainly probable cause to file the lawsuits, and I'll sustain the motion for summary judgment on that basis."

The trial court denied Bartal's motion for reconsideration, which was based on the trial court's failure to make the findings of fact and conclusions of law required by statute and Supreme Court rules. The journal entry on the motion for reconsideration incorporates by reference the ruling made by the trial court on the record. On the record, the trial judge addressed the plaintiff's complaint that the court had not made findings of fact:

"I don't think it was necessary to make detailed findings of facts under the facts of this particular case. I think the findings of fact the court made at the time I

ruled on the motion are sufficient. . . . [I]f I were to have made additional findings of fact, detailed findings of fact, I would have adopted Mr. Warta's proposed findings of fact as the findings of fact of the court, but I didn't [d]o that, and I don't think it's necessary to do that . . . ."

The trial court's ruling was made on October 23, 1997. In preliminary remarks, the trial judge observed that he thought the malicious prosecution action was premature because the Browers still could appeal the conditions imposed on refiling. The trial judge was referring to the medical malpractice action in which conditions were imposed on the Browers' voluntary dismissal of Bartal without prejudice. With regard to the issue of informed consent, the trial judge concluded that the Browers had probable cause to sue Bartal on that ground. In the judge's opinion, Bartal had an affirmative duty to see that Maria's parents had all the relevant information about the surgical procedures that were to be used on Maria, and Bartal breached the duty. With regard to medical negligence other than lack of informed consent, the trial judge concluded that any reasonably prudent plaintiffs' medical malpractice attorney would have found probable cause to sue Bartal in the reports of Drs. James E. Boggan, Bruce van Dam, and John P. Lubicky, which were obtained by Prochaska and Scott before suit was initiated.

In *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980), this court set out the elements necessary to maintain an action for malicious prosecution in a civil case:

"(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

"(b) That the defendant in so doing acted without probable cause.

"(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

"(d) That the proceeding terminated in favor of the plaintiff.

"(e) That the plaintiff sustained damages."

The element of malice is present where a civil action was initiated primarily for a purpose other than that of securing proper adjudication of the claim on which the action is based. *Nelson v. Miller*, 227 Kan. at 278. Probable cause for instituting a civil action "exists when there is a reasonable ground for suspicion, supported by cir-

cumstances sufficiently strong in themselves to warrant a cautious, or prudent, man in the belief that the party committed the act of which he is complaining." *Hunt v. Dresie*, 241 Kan. 647, Syl. ¶ 5. Here, since the district court found that there was probable cause to file the suit against Bartal, it did not consider if Prochaska and Scott acted with malice. Thus, only the finding of probable cause is before us in this appeal.

Bartal contends that the entry of summary judgment against him was improper because there are genuine issues of material fact that precluded summary judgment. On the subject of the trial court's failure to make findings of fact, Bartal complains that "the court refused to clarify its rulings and refused to address the 130-odd pages of individualized facts set forth by the parties. Accordingly, plaintiff requests appellate review of that ruling." Bartal continues: "However, plaintiff does not wish this matter to be remanded for further trial court rulings on this issue." It seems to be Bartal's contention that despite the volume of factual material that the parties believed to be necessary for submission on the motion for summary judgment, this court can decide the matter on the briefs and the record. We will proceed to do so.

Bartal urges the court to look beyond the date the medical malpractice action was filed to determine whether Prochaska and Scott had probable cause to continue prosecuting the action after they had discovered additional facts. The trial court's inquiry did not go beyond the filing of the action. In the case underlying the present one, the cause of action against Bartal was dismissed prior to trial. No one suggests that there is some identifiable point during discovery when previously unearthed facts would have annulled probable cause. Thus, our inquiry on appeal is limited to the time when the action was filed.

The trial court determined that Prochaska and Scott had probable cause to file suit against Bartal for failure to obtain informed consent and for medical negligence. Principles of liability for failure to obtain informed consent to a medical procedure were stated in *Funke v. Fieldman*, 212 Kan. 524, 512 P.2d 539 (1973):

"For there to be liability of a physician for nondisclosure, the unrevealed risk must materialize, and there must be harm to the patient; there must be a causal

relationship between the physician's failure to adequately divulge information and damage to the patient." Syl. ¶ 6.

"A causal connection exists between the physician's nondisclosure to the patient and the patient's damage when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it." Syl. ¶ 7.

"Whether the patient would have refused the treatment or medical procedure had the physician made adequate disclosure is to be determined objectively. If adequate disclosure could reasonably be expected to have caused the patient to decline the treatment or medical procedure had the patient been informed of the kind of risk or danger which resulted in her harm, causation is shown but otherwise not, and the patient's testimony is relevant on such issue, but should not be controlling." Syl. ¶ 8.

Kansas law requires the consent of a parent to a surgical procedure on a young child. *Younts v. St. Francis Hospital & School of Nursing*, 205 Kan. 292, Syl. ¶ 6, 469 P.2d 330 (1970). Consent must be informed, which necessitates the physician to make a reasonable disclosure to the patient of the nature and probable consequences of the recommended surgery and a reasonable disclosure of the possible dangers. *Natanson v. Kline*, 186 Kan. 393, 410, 350 P.2d 1093 (1960). Where the parent of the minor patient fully appreciates the danger involved, the physician's failure to obtain informed consent would have no causal relation to the injury. See *Younts*, 205 Kan. at 299.

In the present case, with regard to the question of informed consent, this court's attention has been directed to two authorization documents in the record. One consent form, which appears to be from Dr. Bartal's office, names Bartal as the physician and describes the proposed procedure as "posterior spinal fusion, L4 - S1, auto bone graft." That form is dated October 15, 1987, and signed by Maria's mother. The other consent form, which bears the hospital logo, names Bartal and Shapiro as the physicians and describes the procedure as "posterior spinal fusion L4 - S1 with autogenous bone graft from extra iliac crest." It is dated October 28, 1987, the day of the surgery, and signed by Maria's mother. Both forms include authorization for additional procedures considered necessary based on findings during the course of the operation.

Bartal asserts that the orthopedic resident, Williams, obtained oral consent for surgery on the LMM or tethered cord. He does not specify who consented. Prochaska asserts that Williams testified that he had a conversation with Mrs. Brower but denied that it was for the purpose of obtaining consent. Prochaska further asserts that Mrs. Brower denies that the conversation took place, but does not give a reference to the record. Based on the record references given in the parties' briefs, this court can state the following: Williams testified that he told Mrs. Brower that any operation around the spinal cord or nerve roots involves the risks of loss of function of the nerves, paralysis, muscle weakness, loss of bowel or bladder control, bleeding, infection, and blood clots. There is nothing in writing about his talking to Mrs. Brower. His testimony had not been given at the time Prochaska filed suit against Bartal on behalf of the Browers. In other words, at the time the decision to file suit was reached, the information available to Prochaska and Scott consisted of the two forms dated October 15 and 28, 1987. As we have seen, the LMM procedure was not alluded to in either consent form.

With regard to reasonable disclosure, the question is whether the materials available to plaintiff's counsel before filing, *i.e.*, the written authorization forms, would support a reasonable belief in a prudent person that Bartal had failed to make a reasonable disclosure to Maria's parents of the nature and probable consequences of the surgery as well as possible dangers. This court has stated: "What is a reasonable disclosure upon which an informed consent may rest must depend upon the facts and circumstances of each case." *Younts*, 205 Kan. 292, Syl. ¶ 5. Only if reasonable minds could not differ as to the conclusion drawn from the evidence would summary judgment be appropriate. The consent forms, the evidence in the present case, do not mention the LMM procedure. Thus, there are unanswered questions about what information was provided to Maria's parents as well as what surgical procedures were anticipated by Dr. Bartal and/or Dr. Shapiro.

Dr. Bartal contends that he could have no liability for lack of informed consent because the parents gave written authorizations for the surgical procedures *he* performed. Central to Bartal's po-

sition is the "fact" that the LMM procedure was performed exclusively by Shapiro. The report of the surgery does not reflect a strict division of labor. For this critical fact, Bartal directed the trial court's attention to notes that he identified as Shapiro's records. The notes contain the following entry: "10-28-87 Surgery - Removal of lipofibroma of spinal cord[.] Dr. Bartal did fusion." If the court accepts that the notes are Shapiro's and that they establish that he alone performed the LMM procedure, the questions remain whether that procedure caused Maria's paralysis and whether it was the sole cause. In this regard, Bartal directed the trial court's attention to a July 1989 letter written by Shapiro to a physical therapist about Maria's disability. It states, in part: "She is profoundly weak as you know in the distal musculature of her lower extremities, left worse than right. This was due to nerve involvement from the tumor which was removed on 10-28-89 [sic]." As noted earlier, we do not know whether the documents relied on by Bartal were known to Prochaska and Scott before suit was filed.

These documents did not affect the trial court's ruling because it was based on the principle that the law placed the burden for obtaining informed consent on the treating or principal physician. Bartal argues that K.S.A. 40-3403(h) prohibits his being held vicariously liable for Shapiro's breach of his duty to inform the Browers of Shapiro's part of the surgery. The argument does not counter the ruling. The trial court concluded that it was Bartal's duty to inform the Browers of all aspects of the surgery. Contrary to the trial court's ruling, Bartal assumes that it was Shapiro's duty to inform the Browers and argues that he cannot be held liable for Shapiro's breach of duty. No authorities supporting either position have been brought to this court's attention.

In *Funke*, 212 Kan. at 533, this court posed the question of whether the obstetrical surgeon, the physician in charge, or Dr. Fieldman, the anesthesiologist, had the duty to make a reasonable disclosure of the dangers of the proposed spinal anesthetic. The court, however, found it unnecessary to answer the question because the record showed that Fieldman took it upon himself to visit Mrs. Funke in her hospital room on the eve of the scheduled

surgery and advise her that a headache was the only risk of the spinal anesthetic. 212 Kan. at 533-34.

In *Funke*, the court cited *Williams v. Menehan*, 191 Kan. 6, 379 P.2d 292 (1963). In that case, a 3-year-old boy died as a team of physicians performed a cardiac catheterization for the purpose of diagnosing his heart condition. The issue on appeal was whether the defendant doctors disclosed to the parents sufficient information about the diagnostic procedure to constitute informed consent. The boy's treating physician referred him to a Wichita pediatrician, defendant Dr. Frank Menehan, who recommended the cardiac catheterization and arranged for it to be performed by the team of Dr. C.T. Hagan, heart specialist, and Dr. Ray T. Parmley, anesthesiologist. Menehan explained the procedure to the boy's mother and to the treating physician, who talked to both parents about it. In addition, Hagan talked to the boy's father. The trial court had sustained the defendant doctors' demurrers, and this court affirmed: "The evidence clearly shows that plaintiffs were informed of the nature of the procedure and of the things the doctors were undertaking to do. They had the facts upon which to base their decision, and we are of the opinion the parents were fully informed." 191 Kan. at 10. There is no discussion of which of the doctors was responsible for advising the parents about the procedure.

Here, Bartal had been regularly treating Maria since shortly after she was born. He recommended the surgical procedure to Maria's parents and he asked Shapiro to assist on the surgery. Shapiro never talked to the Browers or examined Maria prior to the surgery. Bartal was the treating physician and, under these circumstances, had a duty to either fully advise the Browers of the surgical procedure and, if he was incapable of doing so, introduce them to Shapiro and see that he explained the surgical procedure he would be performing.

In entering summary judgment in favor of Prochaska and Scott as to negligence causing paralysis, the trial court placed full reliance on the reports of consulting Drs. Boggan, van Dam, and Lubicky. Those reports were obtained by Prochaska and Scott before suit was initiated. In the trial court's opinion, any reasonably prudent

plaintiffs' medical malpractice attorney would have found probable cause in the reports to sue Bartal. Bearing in mind that the medical records furnished to the consultants do not reflect who performed what parts of the surgery, a review of those reports confirms the trial court's view.

Dr. James E. Boggan reviewed the medical records for Maria's hospital admission in October 1987. Boggan is an associate professor of neurological surgery at the University of California, Davis. He stated, in part:

"[A] lumbosacral fusion was not indicated as the first surgical procedure. The operative description of the management of the lipomyelomeningocele indicates that the surgeons' understanding of the neuropathology was inadequate and the surgical techniques utilized were inappropriate. This was the primary cause of [Maria's] loss of neurological function. . . . The post-operative complication is likely to have added to the neurological injury, particularly when one considers the significant delay in reoperating after recognizing the presence of a decline in her neurological condition from the preoperative state . . . ."

Dr. Bruce van Dam is on the staff at the San Diego Center for Spinal Disorders. After reviewing Maria's records, he wrote: "[T]here was no indication to perform surgery for the lipomeningocele/tethered cord. . . . As a consequence of the surgery on the lipomeningocele it appears the patient sustained a permanent neurological deficit . . . ."

Dr. John P. Lubicky of the Shriners Hospital for Crippled Children in Chicago was critical of the preoperative decision to fuse a portion of Maria's spine in that "the radiographs available to me do not clearly show the actual type of congenital deformity at the lower end of the spine." In addition, he stated that "the records made available to me do not really explain all the reasoning with regard to the decisions made to proceed with the fusion, nor are there any records indicating that special imaging studies such as tomography was done to better elucidate the congenital anomaly at the lumbosacral junction." In closing, he suggested that Bartal misdiagnosed Maria's condition. Dr. Lubicky also was critical of the failure to document the reasons for removing the lipomeningocele and questioned the decision as well as the technique used in removing it:

"[T]he reasons for surgical intervention on the lipomeningocele are not stated anywhere in the record, and based on the fact that this child was apparently neurologically intact and had normal bowel and bladder function preoperately, this would seem to make intervention unjustified, given the potential risks of neurologic deficit after such intervention. . . . [T]he operative technique with regard to the lipomeningocele, from my knowledge of it, seems improper. Again, the issue of why the lipomeningocele was addressed was completely unanswered, as from the records available there is no indication that this girl had clinical cord tethering, and from the records it appears that the increase in the scoliosis that was addressed was the congenital part of the curve, which would increase whether or not cord tethering was present."

In the face of this evidence of probable cause, Bartal argues that the consulting physicians' letters are open to construction and that they are not evidence of a reasonable prefiling investigation. He presents nothing to this court, however, that gives weight to his contentions.

"Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent man in the belief that the party committed the act of which he is complaining." *Nelson v. Miller*, 227 Kan. at 277. In the present case, we conclude that a reasonable person would be warranted in believing that Bartal's medical care of Maria was negligent and that she suffered consequent injury. We find no error in the district court's finding that Prochaska and Scott had probable cause to file the action against Dr. Bartal.

The judgment of the district court is affirmed.

SIX, J., not participating.
DAVID S. KNUDSON, J., assigned.█