Dawn M. PATTERSON, Plaintiff
and Appellant,

v.

Thomas P. HUTCHENS, M.D.,
Defendant and Appellee.

Civ. No. 940175.

Supreme Court of North Dakota.

March 8, 1995.

William P. Zuger, of Zuger Law Offices, Bismarck, for plaintiff and appellant.

William A. Strutz, of Fleck, Mather & Strutz, Bismarck, for defendant and appellee. Appearance by Robert J. Udland.

VANDE WALLE, Chief Justice.

Dawn M. Patterson appealed from a judgment dismissing her malpractice action against Thomas P. Hutchens, M.D., and awarding Hutchens costs and disbursements. We modify the judgment and affirm it as modified.

On January 5, 1990, Patterson went to Hutchens for treatment of vaginal spotting and pelvic pain. On January 8, 1990, Hutchens performed a diagnostic laparoscopy and a dilation and curettage. Hutchens performed a vaginal hysterectomy on March 7, 1990. Patterson's pain continued, and on September 19, 1990, Hutchens performed a bilateral oophorectomy. Patterson continued to experience pelvic pain. On May 1, 1991, Hutchens performed a laparoscopy for lysis of adhesions. On May 10, 1991, Hutchens advised Patterson that there was nothing wrong with her and advised her to discontinue further treatment.

Patterson sued Hutchens in August 1992, generally alleging negligence and specifically alleging:

> "The performance of the hysterectomy and oophorectomy by Dr. Hutchens was totally without medical justification, done solely for economic motivation, and in reckless disregard of Dawn Patterson's basic rights as a patient."

The jury found that Hutchens was not negligent in his treatment of Patterson. A judgment was entered dismissing Patterson's action and awarding Hutchens costs and disbursements of $76,375.27. After Patterson objected to the costs and disbursements, the trial court ordered Dr. Emanuel Friedman's expert witness fee reduced from $30,887 to $20,887, but otherwise confirmed the award.

## I.

■ Patterson contends that the trial court erred in excluding documentary evidence assertedly demonstrating that Hutchens excessively utilized surgery for economic gain. The trial court excluded evidence showing (1) every hysterectomy (removal of uterus), oophorectomy (removal of ovary), and salpingo oophorectomy (removal of ovary and fallopian tube) performed at St. Alexius Medical Center in the five-year period of 1987 through 1991, by the ten surgeons (including Hutchens) performing such procedures there, with each patient identified by age; (2) Hutchens performed a larger share of all the procedures than any of the other physicians; and (3) Hutchens performed the procedures at a higher rate than other physicians on patients under 30 years of age. The trial court excluded evidence showing that Hutchens was the highest grossing physician at Mid Dakota Clinic in 1990 and 1991, and showing that he outproduced the next highest earning physician at the clinic by a signif-

icant margin. The trial court also excluded evidence of Mid Dakota Clinic production records showing "how many procedures he's doing."

Patterson wanted the evidence admitted to show that Hutchens excessively utilized surgery for economic gain, rather than medical necessity. Patterson contended that the evidence bore on Hutchens's motivation, state of mind, credibility, opportunity, and intent. *See* Rule 404, N.D.R.Ev.[1] Hutchens's counsel told the court about the number of witnesses that might be called:

"First of all, if [Patterson's attorney] intends to get into this whole issue of statistics and the number of surgeries Dr. Hutchens performs around town, we intend to call these people to testify that they do very little of the types of procedures he does. They refer all their difficult, complex cases to him to perform those hysterectomies and oophorectomies in younger people...."

\* \* \* \* \* \*

"If the Court allows the statistical evidence that Mr. Zuger wants to present, it is our intention to have Dr. Hutchens discuss a number of these other surgeries that he performed from 1987 to 1991 to show the jury why they were medically warranted and justified. Dr. Hutchens will also be prepared to present a number of these females under age 30 that had hysterectomies and oophorectomies to describe why they wanted the surgeries done and the fact that they are pleased with those surgeries at this point in time and they didn't feel they were medically unnecessary at the time."

The trial court was concerned with relevancy[2] and the time and expense[3] associated with the reception of the proposed statistical evidence:

"It may tend to prove that he does unnecessary surgeries. That's possible. But what does it tell us about this case?

\* \* \* \* \* \*

"[I]t's not only a question of whether or not it has a tendency to prove the proposition that Mr. Zuger wants it to prove, but whether or not the effort involved in that to try to overcome it, that the amount of time and expense involved in that proposition is worth it in terms of waste of time to use the classic phrase. Sometimes the ultimate value of the information is just not worth what I go through to get it to start with. I think I'm more concerned about whether or not it has any relevancy at all."

Relevancy is somewhat problematic, as the proffered evidence is susceptible of at least three reasonable inferences: (1) Hutchens performs medically unnecessary surgery for economic gain; (2) Hutchens is a very popular doctor; and (3) other doctors refer a lot of cases to Hutchens. "In determining a relevancy question in particular, the trial judge is generally accorded 'broad discretion' in weighing the many factors that figure into the decision." 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 401[01], p. 401–08 (1994). Rule 403 "vests wide discretion in the trial court to control the introduction of evidence at trial and our review is limited to determining whether that discretion was abused." *First Nat'l Bank & Trust Co. v. Brakken,* 468 N.W.2d 633, 636 (N.D.1991). *See also Williston Farm Equip., Inc. v. Steiger Tractor, Inc.,* 504 N.W.2d 545 (N.D.1993). "Rule 403 recognizes that 'relevance does not ensure admissibility. There remains the question of wheth-

---

1. Rule 404(b), N.D.R.Ev., provides that evidence of other acts is not admissible to prove character to show action in conformity therewith, but may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

2. Rule 401, N.D.R.Ev., provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

3. Rule 403, N.D.R.Ev., provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

er its value is worth what it costs.'" *Weinstein's Evidence, supra,* ¶ 403[01], p. 403–13 [quoting 1 McCormick, *Evidence* § 185 at 779 (West 4th ed. 1992) ]. Evidence may be excluded if it "and the answering evidence that it provokes might unduly distract the jury from the main issues" or if "the evidence offered and the counterproof may consume an inordinate amount of time." 1 McCormick, *Evidence* § 185, p. 781 (West 4th ed. 1992). "Wise judges may come to differing conclusions in similar situations.... Accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers." *Id.,* at 782–83. "Courts are ... reluctant to admit evidence ... if detailed rebuttal evidence or complicated judicial instructions would be required to demonstrate that the evidence actually has little probative value." *Weinstein's Evidence, supra,* ¶ 403[04], p. 403–67.

We conclude that the trial court did not abuse its discretion in excluding Patterson's proffered statistical evidence on the number of surgical procedures performed by Hutchens, his share of the relevant surgical procedures performed at St. Alexius Medical Center, Mid Dakota Clinic evidence of the number of surgical procedures performed by Hutchens, or evidence of his income in comparison with other doctors at Mid Dakota Clinic. The evidence was of questionable relevance in light of the varying inferences to which it was susceptible. The evidence was likely to induce time-consuming, distracting, and, perhaps, confusing evidence to rebut it. Preventing Patterson from using this kind of circumstantial evidence of performing unnecessary surgery for economic gain did not in any way prevent her from introducing direct evidence that Hutchens performed unnecessary surgical procedures upon her.

## II.

Patterson contends that the trial court wrongly excluded medical records of Dr. Eugene Mead. Patterson saw Dr. Mead on December 10, 1991, and on December 18, 1991. Mead concluded in written notes:

"I personally would not have done an abd. hysterectomy and an oophorectomy on such a young lady, however, I did not do it, Dr. Hutchens did."

"I do not think she should have had the hysterectomy done in the first place but since she did I am not sure what we can do for her at this point."

Mead moved to another state and was not a witness at the trial. Concerned about the defense's lack of opportunity for cross-examination, the trial court excluded those entries from being admitted into evidence:

"And as far as Mead goes, it smells bad to me. I'm going to keep it out.

\* \* \* \* \* \*

"That's the best explanation I can give you. There is no opportunity to cross-examine it. The fact that it's in the medical record doesn't change that any. It's too important to allow it to go in just because it happens to be an opinion in a medical record."

Patterson contends that the records containing Dr. Mead's opinions were admissible under Rule 803(6), N.D.R.Ev.:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\* \* \* \* \* \*

"(6) *Records of Regularly Conducted Business Activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Patterson's attorney said at oral argument that Mead did not testify because under Rule

803(6), N.D.R.Ev., he had a right to get Mead's opinion admitted in evidence without paying for his time and airplane ticket to get here.

In *Munro v. Privratsky*, 209 N.W.2d 745, 752 (N.D.1973), this court held that, under the Business Records Act, the trial court did not abuse its discretion in failing to receive as part of a treating doctor's business records, a letter from another doctor, who, because he was dead, could not be cross-examined, and the letter contained "findings and conclusions which, if received, would become a part of the record without affording Munro an opportunity to cross-examine on the very matters in issue." Because Mead drew his conclusions from just two meetings with Patterson, the trial court may have had little confidence in the trustworthiness of Mead's opinions. "If the expert is available and the diagnostic opinion is of a kind competent physicians may disagree upon, the judge has discretion to require the expert to testify to ensure trustworthiness through cross-examination, particularly if the medical issue is crucial, and the patient's liberty is at stake." 4 *Weinstein's Evidence, supra*, ¶ 803(6)[06], p. 803–223.

Mead was not at the trial for cross-examination about the opinions he put in Patterson's medical records. The opinions Mead expressed were "of a kind competent physicians may disagree upon." The medical propriety of the hysterectomy performed by Hutchens and addressed in Mead's recorded opinions was a crucial issue in the case, being one of the "very matters in issue." We conclude that the trial court did not abuse its discretion in refusing to admit into evidence the medical records containing Mead's opinions.

### III.

■ Patterson contends that Hutchens was allowed to call an excessive number of medical expert witnesses. In addition to Hutchens, the defense named four experts—Drs. Dennis Lutz, Robert Bury, Emanuel Friedman, and Gary Hankins. Patterson unsuccessfully sought to limit the number of experts before trial. Early in the trial, the trial court declared:

"Nevertheless, if things start getting repetitious, if you have four guys just repeating the same thing and I hear an objection about this being repetitious stuff, I'm going to give that serious consideration."

After Drs. Lutz and Bury testified, the trial court asked defense counsel how testimony of Friedman and Hankins was going to be different and the following exchange occurred:

"MR. STRUTZ: Not a lot different from what Dr. Bury has said, to be honest with you. Dr. Hankins would not be. Friedman is different. Dr. Hankins is not.

"THE COURT: I had already half decided we were over doing this so I'm going to allow Dr. Friedman and you can tell Dr. Hankins he can stay home or whatever."

Patterson contends that Dr. Friedman's testimony was repetitive and that Hutchens misled the trial court by stating that Friedman's testimony was going to be different.

"Trial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." *Johnson v. Ashby*, 808 F.2d 676, 678 (8th Cir.1987). Rule 403, N.D.R.Ev., "vests wide discretion in the trial court to control the introduction of evidence at trial and our review is limited to determining whether that discretion was abused." *First Nat'l Bank & Trust Co. v. Brakken, supra*, 468 N.W.2d at 636. Ordinarily, the trial court "has a broad discretion in limiting the number of witnesses." *Fuhrman v. Fuhrman*, 254 N.W.2d 97, 101 (N.D.1977).

During the course of Friedman's testimony, Patterson did not object that it was repetitious of the testimony of previous witnesses. Lutz testified that prior to Patterson's hysterectomy, "the most likely diagnosis" was adenomyosis. Bury testified that Patterson had chronic pelvic pain and that its etiology made no difference in treatment. Friedman testified that he could not determine what Patterson's problem was, although he did discuss a number of possibilities in addition to those mentioned by previous witnesses. We conclude that the trial court was not misled about Friedman's testimony and did

not abuse its discretion by allowing Friedman to testify.

## IV.

■ Patterson contends that the trial court erred in instructing the jury that a physician is not liable for an error in judgment. The trial court instructed the jury:

"In administering to his patient, a physician must be free to exercise reasonable judgment and is not liable for an error in judgment not arising from his negligence.

"When there is reasonable doubt as to what should be done in accordance with reasonable current practice, he is not responsible for a reasonable decision which turns out to be erroneous. However, this error in judgment does not extend to a case in which the situation precipitating the erroneous decision occurs because of the doctor's lack of the knowledge which he should possess or the failure to exercise that degree of skill and care which it is his duty to apply."

Patterson lodged the following objections:

" 'A physician must exercise reasonable judgment and is not liable for an error in judgment.' You go on to say not arising from negligence. If you have a case involving anybody but a doctor, you don't say a driver driving down a street is responsible for his negligence but not for errors in judgment not arising out of that negligence. It changes in some not so subtle ways the jury's perception of the term of negligence. Errors in judgment may be negligence if you use the reasonable standards of care. And I think adding that one qualifier I think simply confuses jurors."

Patterson's analogy between the driving of a car and a professional person rendering professional service is inapt. The probability of a juror believing that a professional assures a positive result is greater than that the driver of a car assures against any acci-

dent. Nevertheless, error-in-judgment instructions have been held to be undesirable. *E.g., Riggins v. Mauriello,* 603 A.2d 827 (Del. 1992); *Sleavin v. Greenwich Gynecology & Obstetrics, P.C.,* 6 Conn.App. 340, 505 A.2d 436, *cert. denied,* 199 Conn. 807, 508 A.2d 32 (1986). However, the trial court's "error in judgment" language was adequately explained in the challenged instruction. The instruction deals with cases in which a physician must choose one of several treatment alternatives, and "when read in context could not have misled or confused the jury." *Sleavin v. Greenwich Gynecology & Obstetrics, P.C., supra,* 505 A.2d at 441.

■ Patterson also contends that "the instruction substituted the original standard of 'reasonable doubt' for the civil standard of 'greater weight' to weigh the evidence and effectively shield the defendant doctor behind a criminal, rather than civil, burden of proof."

The trial court's instruction was concerned with situations in which reasonable physicians might entertain reasonable doubts as to the best treatment method, or the appropriateness of a treatment method. The instruction was not concerned with the burden of proof and cannot reasonably be read as substituting the burden of proof used in criminal cases for the burden of proof used in civil cases. Furthermore, the trial court properly instructed the jury that before Patterson could prevail on her claim, the greater weight of the evidence must establish that Hutchens was negligent.

## V.

■ Patterson contends that the trial court allowed Hutchens excessive costs. Hutchens taxed costs and disbursements of $76,375.27. Contending that Hankins' testimony was excluded as repetitious, and that Friedman's should have been, Patterson objected to the following disbursements claimed by Hutchens:

"Deposition transcript (12/1/92)
Dr. Emanuel Friedman $ 369.50

Deposition transcript (9/9/93)
Dr. Gary Hankins 217.50

Dr. Emanuel Friedman testified 3/2/94:
Expert witness fees for pretrial
preparation work and testimony 30,887.00
Transportation/mileage/lodging 1,655.11

Dr. Gary Hankins:
Expert witness fees for trial
preparation and deposition fee 16,025.00

Travel expenses to Carlsbad, CA
on 9/9/93 for deposition of
Dr. Hankins 1,400.50

Travel expenses to New York, NY
on 12/1/93 for deposition of
Dr. Emanuel Friedman (includes
airfare and lodging) <u>1,476.17</u>
$52,030.78"

---

The trial court reduced Friedman's fee by $10,000 and otherwise overruled Patterson's objections.

 Under § 28–26–06, N.D.C.C.,[4] the disbursements complained of lie within the trial court's discretion, as we explained in *Keller v. Vermeer*, 360 N.W.2d 502, 508 (N.D. 1984):

" 'The trial court may exercise its discretion as to the number of witnesses for which a prevailing party may tax costs.' *United Development Corp. v. State Highway Department*, 133 N.W.2d 439, 444 (N.D.1965). The allowance of disbursements under § 28–26–06(2), N.D.C.C., is within the trial court's discretion. *Schwartz v. Ghaly*, 318 N.W.2d 294 (N.D. 1982). 'The amount of fees to be paid to an expert must be left to the sound discretion of the trial court. Actual expenses, including travel expenses, also may be allowed if they are reasonable.' *Peterson v. Hart*, 278 N.W.2d 133, 137 (N.D.1979)."

The expenses incurred in taking a deposition for use at trial may be taxed, whether the deposition is used in a trial or not. *Fleck v. ANG Coal Gasification Co.*, 522 N.W.2d 445 (N.D.1994). Under § 28–26–06(2), N.D.C.C., that is also true of obtaining evidence "for use on the trial." The allowance of an expert witness fee for a witness who did not testify at trial is within the discretion of the trial court. *Wastvedt v. Vaaler*, 430 N.W.2d 561 (N.D.1988). A trial court's decision on fees and costs will not be overturned on appeal unless an abuse of discretion is shown. *Buzzell v. Libi*, 340 N.W.2d 36 (N.D.1983).

 Medical experts are very expensive. A party is not permitted to call an unlimited number of witnesses and then charge an opponent with the expense. *United Development Corp. v. State Highway Dept.*, 133 N.W.2d 439 (N.D.1965). By letter of November 11, 1993, Patterson's counsel requested a pretrial conference to consider a limitation on

4. Section 28–26–06, N.D.C.C., provides for the taxation of disbursements:

"In all actions and special proceedings, the clerk shall tax as a part of the judgment in favor of the prevailing party his necessary disbursements as follows:

\*　\*　\*　\*　\*　\*

"2. The necessary expenses of taking depositions and of procuring evidence necessarily used or obtained for use on the trial;

\*　\*　\*　\*　\*　\*

"5. The fees of expert witnesses. Such fees must be reasonable fees as determined by

the court, plus his actual expense. The following are nevertheless in the sole discretion of the trial court:

"a. The number of expert witnesses who are allowed fees or expenses;

"b. The amount of fees to be paid such allowed expert witnesses, including an amount for time expended in preparation for trial; and

"c. The amount of costs for actual expenses to be paid such allowed expert witnesses."

the number of expert witnesses. A conference was held on January 31, 1994, but that matter was not resolved. The matter was brought up again on February 23, 1994, the second day of trial, before any expert witnesses testified, but no limit was set. After Drs. Lutz and Bury testified, Hutchens's counsel conceded that Dr. Hankins's testimony would be repetitious of Dr. Bury's testimony.

Hutchens's counsel must have known earlier than trial that testimony of Dr. Hankins would be repetitious. In light of pretrial written and oral discussions about limiting the number of expert witnesses, the defendant's concession that Dr. Hankins's testimony would be repetitious of Dr. Bury's testimony, and the fact that Dr. Hankins was not permitted to testify at trial, we conclude that the trial court abused its discretion in allowing Hutchens expert witness fees for trial preparation for Dr. Hankins. We order that the disbursements allowed for Dr. Hankins be reduced by $10,000, and that the judgment be modified accordingly. Other than with respect to Dr. Hankins, Patterson "offered no evidence contradicting the reasonableness" [*Taghon v. Kuhn,* 497 N.W.2d 403, 407 (N.D.1993)] of the disbursements allowed, and we conclude that the trial court did not otherwise abuse its discretion.

Affirmed as modified.

SANDSTROM and NEUMANN, JJ., and PEDERSON and BERT L. WILSON, Surrogate Judges, concur.

BERT L. WILSON and VERNON R. PEDERSON, Surrogate Judges, sitting in place of MESCHKE, J., and LEVINE, J., disqualified.