2004 ND 173

**Josiah FLATT, by and through his Natural Guardians Anita FLATT and James Flatt, Plaintiff and Appellant,**

v.

**Sunita A. KANTAK, M.D., MeritCare Hospital, and State of North Dakota, Defendants and Appellees.**

No. 20030285.

Supreme Court of North Dakota.

Sept. 3, 2004.

Zenas Baer, Zenas Baer & Associates, Hawley, MN, for plaintiff and appellant.

Angela Elsperger Lord (argued) and Jane C. Voglewede (on brief), Vogel Law Firm, Fargo, for defendant and appellee, Sunita A. Kantak, M.D.

Douglas A. Bahr, Solicitor General, Attorney General's Office, Bismarck, for defendant and appellee State of North Dakota.

VANDE WALLE, Chief Justice.

[¶1] Josiah Flatt, by and through his natural guardians Anita and James Flatt, appealed from an order denying his motion for a new trial and from an amended judgment entered upon a jury verdict finding Dr. Sunita Kantak was not negligent in obtaining Anita Flatt's informed consent for the circumcision of Josiah Flatt. We affirm.

I

[¶2] James and Anita Flatt are the parents of Josiah Flatt, who was born on March 6, 1997, at Meritcare Hospital in Fargo. On March 7, 1997, Dr. Kantak performed a circumcision on Josiah Flatt. Josiah Flatt's medical records, which were

signed by Dr. Kantak and dated March 6, 1997, state, "RISKS OF LOCAL ANESTHESIA AND CIRCUMCISION DISCUSSED. PROCEDURE DESCRIBED. PARENT EXPRESSES UNDERSTANDING." According to Dr. Kantak, her discussion about circumcision with a parent typically includes a statement that circumcision is not medically recommended but is a choice, lidocaine is used for anesthesia with a risk of hemorrhage or seizure, circumcision is a minor surgery but is a surgery with risks such as bleeding, infection, trauma to the penis, and uretal meatus, and a benefit of circumcision includes less risk of urinary tract infection. Dr. Kantak testified it was not her standard practice to discuss with a parent every reported risk of circumcision. According to Meritcare's records, Anita Flatt was given written materials, including a booklet entitled "Infant Care," which discussed circumcision, and a booklet entitled "Should Your Infant Boy Be Circumcised?" Anita Flatt denied receiving any written materials or booklets while she was at the hospital. She recalled speaking with Dr. Kantak before the circumcision, but she denies being told by Dr. Kantak about any risks of circumcision, except for pain. On March 6, 1997, Anita Flatt signed a form documenting her consent for Josiah Flatt's circumcision. The form stated that her doctor had explained the nature and purpose of the surgery, other methods of treatment, risks involved, and the possibility of complications, and that she understood those risks and options.

[¶ 3] According to Anita and James Flatt, they later learned of other risks of circumcision and what the procedure entailed. They claimed Anita Flatt would not have consented to the procedure if there had been adequate disclosure. Josiah Flatt, by and through Anita and James Flatt, sued Dr. Kantak and Meritcare, alleging Dr. Kantak failed to obtain Anita Flatt's informed consent before performing the circumcision. Flatt also sued the State of North Dakota, alleging N.D.C.C. § 12.1–36–01, the female genital mutilation law, violated the equal protection provisions of the federal and state constitutions.

[¶ 4] The trial court dismissed Josiah Flatt's federal and state constitutional challenges, concluding he lacked standing to challenge N.D.C.C. § 12.1–36–01. The court dismissed Flatt's claims against Meritcare before submitting the case to a jury, and the jury returned a verdict finding Dr. Kantak was not negligent in obtaining Anita Flatt's consent for the circumcision. The court denied Flatt's motion for a new trial, and a judgment, with costs and disbursements, was entered dismissing the action.

II

[¶ 5] Flatt argues the trial court erred in preventing his experts, Dr. Christopher Cold and Dr. Robert S. Van Howe, from testifying on the standard of care for obtaining informed consent for an elective medical procedure on an infant. He argues expert testimony is necessary to establish the degree of skill and care required of a physician and whether specified acts fall below that standard. He argues the trial court erred in excluding his experts' testimony, "ruling as a matter of law that the 'standard of care' is a legal issue."

[¶ 6] "The doctrine of informed consent is essentially the duty of a physician to disclose sufficient information to permit a patient to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure." *Koapke v. Herfendal,* 2003 ND 64, ¶ 14, 660 N.W.2d 206. If a physician fails to obtain a patient's informed consent, the physician may be

found negligent. *Jaskoviak v. Gruver*, 2002 ND 1, ¶ 13, 638 N.W.2d 1. "A plaintiff in an informed-consent case must establish breach of a physician's duty of disclosure, causation, and injury." *Id.* An integral part of a physician's duty to a patient is the disclosure of available choices for treatment and the material and known risks involved with each treatment. *Winkjer v. Herr*, 277 N.W.2d 579, 587 (N.D.1979).

In *Winkjer*, 277 N.W.2d at 587, we recognized that a majority of courts have related a physician's duty of disclosure to a subjective standard of the custom of physicians practicing in the community, while a growing number of jurisdictions have adopted an objective standard for measuring the performance of a physician's duty of disclosure based on conduct that is reasonable under the circumstances. We said the jurisdictions adopting the objective standard have stated that a patient's right of self-determination in a particular treatment requires a standard set by law for physicians rather than a subjective standard that physicians may impose upon themselves, and expert testimony on the standard of disclosure is generally allowed as relevant evidence, but that testimony supplements and does not define a physician's legal duty to inform. *Id.* at 587–88. We acknowledged that expert medical testimony may not be required to establish the existence of a duty to disclose risks under the objective standard, but under either the objective or subjective standard, expert medical testimony is generally necessary to identify the risks of treatment, their gravity, likelihood of occurrence, and reasonable alternatives, especially when that information is outside the common knowledge of laypersons. *Id.* at 588. In *Winkjer*, at 588–89, we concluded the plaintiff had failed to produce expert testimony to refute the defendant's showing there was no genuine issue of fact regarding disclosure of a known risk. Although we recognized a growing number of jurisdictions had adopted the persuasive reasoning of the objective standard, we did not specifically decide whether the standard for disclosure is measured by "the custom of the physician practicing in the community," or by what is "reasonable under the circumstances." *Winkjer*, at 587–89. *See Lemke v. United States*, 557 F.Supp. 1205, 1212 (D.N.D.1983); *Fortier v. Traynor*, 330 N.W.2d 513, 517 (N.D. 1983). *See also* Laurel R. Hanson, Note, *Informed Consent and the Scope of a Physician's Duty of Disclosure*, 71 N.D. L.Rev. 71, 77–80 (2001).

[¶ 8] In *Jaskoviak*, 2002 ND 1, ¶¶ 17–19, 638 N.W.2d 1, without explicitly adopting either the subjective or objective standard of disclosure, we discussed common ground under both standards:

In acquiring a patient's informed consent to a medical procedure, a physician should disclose a number of things:

It is sometimes said that the physician should disclose the diagnosis, the general nature of the contemplated procedure, the material risks involved in the procedure, the probability of success associated with the procedure, the prognosis if the procedure is not carried out, and the existence and risks of any alternatives to the procedure.

1 [Dan B.] Dobbs, [*The Law of Torts*], § 251 [2001]. *See also* Steven E. Pegalis, *American Law of Medical Malpractice 2nd* § 4:1, pp. 186–88 (1992), noting the American Hospital Association Risk Management Handbook advises disclosing the nature and purpose of the proposed test or treatment, the probable risks and benefits of the proposed intervention, alternative forms of care and their probable risks and benefits, remote

or unusual risks involving severe injury, disability, or death, and the risks of refusing care or diagnostic tests.

Assessing the materiality of a risk involves a two-pronged analysis: (1) "an examination of the existence and nature of the risk and the probability of its occurrence"; and (2) "a determination by the trier of fact of whether the risk is the type of harm which a reasonable patient would consider in deciding on medical treatment," *Guidry [v. Neu],* 708 So.2d [740,] 744 [(La.Ct.App.1997)]. The materiality of information about the risk of a potential injury is a function of the severity of the potential injury and of the likelihood it will occur. 2 [J.D. Lee and Barry A. Lindahl,] *Modern Tort Law,* § 25:46 [(Rev. ed.1989)]; 1 *Dobbs, supra,* at § 251. A physician is not required to inform a patient of risks that are so remote as to be negligible even where the consequences may be severe, and is not required to inform the patient of a very minor consequence even though the probability is high. 2 *Modern Tort Law, supra,* at § 25:46. Thus, as this Court recognized in *Winkjer,* 277 N.W.2d at 588:

A duty to disclose can arise only if the physician knew or should have known of the risks to be disclosed. *Cornfeldt v. Tongen,* [262 N.W.2d 684 (Minn.1977)]. Also, a physician is not required to disclose all possible risks and dangers of the proposed procedure but only those that are significant in terms of their seriousness and likelihood of occurrence. There is no need to disclose risks of little consequence, those that are extremely remote, or those that are common knowledge as inherent in the treatment. *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d [1,] 11 [(Cal.1972)].

Ultimately, a "trier of fact must determine whether a reasonable person in the plaintiff's position would attach significance to the specific risk." *Guidry,* 708 So.2d at 744. "The disclosure requirement is in essence a requirement of conduct prudent under the circumstances." 2 *Modern Tort Law, supra,* at § 25:47.

"[E]xpert medical testimony is generally necessary to identify the risks of treatment, their gravity, likelihood of occurrence, and reasonable alternatives." *Winkjer,* 277 N.W.2d at 588. "The necessity for expert testimony is particularly so when such information is outside the common knowledge of laymen." *Id.* "Expert testimony may be necessary under the lay standard, at least to establish the existence of a risk, its likelihood of occurrence, and the type of harm in question; after that, however, expert evidence may not be required." 2 *Modern Tort Law, supra,* at § 25:46. "However, experts may be required to show both that material information existed and that the defendant should reasonably have known about it." 1 *Dobbs,* at 656.

[¶ 9] Under both the subjective and objective standards, a physician must disclose material risks involved in a procedure, but the physician need not disclose all possible risks and dangers of a proposed procedure, and expert medical testimony is generally necessary to identify the material risks of treatment, their likelihood of occurrence, their gravity, that the physician reasonably should have known of the risk, and reasonable alternatives. *Jaskoviak,* 2002 ND 1, ¶ 18, 638 N.W.2d 1; *Winkjer,* 277 N.W.2d at 588. *See also Koapke,* 2003 ND 64, ¶ 15, 660 N.W.2d 206.

[¶ 10] To the extent Flatt claims the applicable legal standard for informed consent requires the disclosure of all risks for an elective procedure for a minor, he has

not cited any caselaw to support that claim. His reliance on isolated language from *Jaskoviak* that "all risks potentially affecting the decision must be unmasked" is misplaced. In *Jaskoviak*, 2002 ND 1, ¶ 16, 638 N.W.2d 1 (quoting *Canterbury v. Spence*, 464 F.2d 772, 786–87 (D.C.Cir. 1972)), we said a physician need not disclose all possible risks to the patient, rather the physician is required to disclose those risks that would be material to a reasonable patient's decision. *See Canterbury*, at 786 (declining to require "full" disclosure by a physician; stating it is unrealistic to expect a physician to discuss every risk of proposed treatment no matter how small or remote and "full" disclosure requires something less than "total" disclosure).

[¶ 11] In order to resolve and provide context to Flatt's argument about the trial court's decision on his experts' testimony, we quote extensively from Flatt's citations to the court's ruling. During Flatt's direct examination of Dr. Cold, the following questioning occurred:

Q And you mentioned a term this morning, "proxy consent." Is the duty when you're obtaining proxy consent different than when you are obtaining express consent?

MS. LORD: Your Honor, I object to that question as far as requesting an instruction on the law for a witness who's not qualified to do so.

THE COURT: Sustained.

Q (Mr. Baer continuing) Are you familiar with the duty of a physician when obtaining proxy consent?

A Yes, I am.

Q Could you describe that duty?

A Proxy consent—

MS. LORD: Same objection, Your Honor.

THE COURT: Sustained. It's a matter of law. The Court will be instructing the jury on this. Please move on, Mr. Baer.

. . . .

Q Now, when performing elective surgeries, what is the obligation of a medical doctor in disclosing risks? What type of risks need to be disclosed?

A Basically all the risks.

MS. LORD: I request that that answer be stricken from the record. It is— I object to the form of the question. Mr. Baer has been instructed not to request instructions on the law from this witness, and that is a question that was inappropriate.

MR. BAER: May we approach the bench, Your Honor?

THE COURT: Yes.

(Discussion at the bench, out of the hearing of the jury and the court reporter.)

THE COURT: The objection is sustained.

. . . .

Q Okay. Then the next paragraph [of the "Infant Care" booklet] deals with consent.

A Right. "The written and verbal consent of one, or preferably both parents, is required." I think that's critical because both parents are involved in this decision. So I would agree with that.

MS. LORD: Your Honor, I request that the answer be stricken. This witness is again being asked questions about the state of the law, which he's not qualified to answer, and only the Court can give the jury the instruction on the law.

THE COURT: Sustained. The jury is admonished that the last response is stricken. You're not to consider it as evidence.

[¶ 12] After the court sustained those objections to Dr. Cold's testimony, the following colloquy occurred outside the presence of the jury:

MR. BAER: There are two issues I would like to address to the Court at this time, and the one is to put on the record the discussion we had at the bench during the testimony of Dr. Cold. And it dealt with the line of questioning of what the duty is of a doctor to disclose certain risks or benefits of a procedure.

And I believe that the context was that I was attempting to establish that the duty to disclose on an elective procedure is a different duty than is on a medically indicated procedure, and the Court did not allow inquiry into establishing that duty. I believe the Court indicated that the Court would give the duty. It seems to me that that misreads what the law is in North Dakota, that a plaintiff must establish through expert witnesses what the duty is of a medical doctor.

And in this case, I have been attempting to establish that duty of the elements and the extent of disclosure required in an elective procedure. And the case that I would point to is the Jaskoviak case, which holds for the proposition that you need expert testimony to establish what the risks are and what risks must be disclosed for a particular procedure.

And I think it is extremely prejudicial to the plaintiff's case to disallow the expert witness to testify as to the duty associated with an elective procedure versus one of a medically indicated procedure. Thank you.

THE COURT: Defense.

MS. LORD: Your Honor, Mr. Baer was eliciting questions on the legal standard. We have no objection to questions being asked about the standard of care or whether the standard of care was met in this case, or what the material risks of the procedure are or if they're minor or significant, the benefits of the procedure. Those are all issues that go to informed consent. We had no objection to that line of questioning.

But when Mr. Baer is asking a witness on what the law requires for the duty of disclosure, that's something that the Court instructs the jury. And even though he needs expert testimony to state what the standard of care is, the expert cannot testify as to what the law will be at the close of the case.

THE COURT: It's my recollection that I did sustain their objection.

MR. BAER: Yes, you did.

THE COURT: That is on the record. So have you made your record?

MR. BAER: I made my record. I would like to know whether that is the ruling of the Court.

THE COURT: The ruling of the Court is that the objection is sustained.

MR. BAER: I want to make sure that I understand it. I don't recall me asking the expert witness any question about what the legal standard was. I only asked about what the duty was in a nonmedically indicated procedure. Not what the legal standard was. And I got to that question, their objection was raised that it invades the province of the Court. I don't see that as being the case. I want to be able to explore that with the expert witness.

THE COURT: I think the danger is that the jury could assume that that is the legal standard, even though you didn't say legal standard or legal duty. And I believe I did say to the jury that I would be giving them instructions. Did I say that?

MR. BAER: I don't think so.

MS. VOGLEWEDE: You did.

THE COURT: If you want me to reiterate that again, I will do that, but the law has to come from the Court. You might have a difference of opinion with me, and I respect that, but I don't want the jury to be misled and think that any witness can tell them what the law is, because that's got to come from the Court.

MR. BAER: I certainly was not attempting to elicit from this expert what the law is.

THE COURT: You asked what is the duty. And that goes to what the law says they have to tell.

MR. BAER: Well, it is a standard.

THE COURT: I am not going to argue with you. That's what I understood you to ask. What is the duty, what must a physician—what's the duty of a physician. That goes to what is the duty that the law has to—the Court has to instruct on the law. You can ask about the risks, the benefits, those kinds of things, but the duty is something that is written in the law, and that's for the Court. And that's my decision in that regard.

[¶ 13] During Flatt's direct examination of Dr. Robert Van Howe, the following questioning occurred:

Q When a medical doctor talks about informed consent and obtaining informed consent, are there certain things, if that medical doctor is meeting the standard of care, that they must obtain and assess of a patient or a surrogate before they can get an informed consent?

A There are basically three elements. And this document lists it as four, although I think of the second and third

as being one. First, there has to be disclosure.

MS. VOGLEWEDE: Your Honor, I am going to object to this again. It's attempting to have the witness state what the legal requirements are for the duties of informed consent.

THE COURT: Mr. Baer, we have discussed this before. I have ruled accordingly before. And this is a matter of the law, the law comes from the Court.

THE WITNESS: Actually, I think this is ethical.

THE COURT: I'm sorry, don't argue with me.

THE WITNESS: I'm sorry.

THE COURT: So the objection is sustained.

Q (Mr. Baer continuing) Okay. Are you familiar, Dr. Van Howe, with the standard of practice of pediatricians to obtain informed consent?

A Yes, sir, I am.

Q And in order to meet that standard, what must a physician obtain?

A The physician needs to provide disclosure of information that the decision maker needs in order to make an informed decision. He needs to assess whether the receiver of the information understood the information and is competent to make the decision. And the third is that the decision is made voluntarily, without coercion.

Q Does the AAP statement on informed consent address the issue about the duty of a physician to a child patient?

A Yes, it does.

Q And does it say that the medical professional has a legal and ethical duty to their child patient to render competent medical care based on what that

patient needs, not what somebody else expresses?

A That is correct.

MS. VOGLEWEDE: Objection.

THE COURT: When there's an objection, do not answer because I need to make a ruling.

MS. VOGLEWEDE: Objection, leading, and objection on the same grounds that it calls for an apparent explanation of what the legal duty is as opposed to accepted medical practice.

THE COURT: Sustained.

Q (Mr. Baer continuing) The AAP statement does address the issue of problems with proxy consent; is that correct?

A That is correct.

Q What are the problems that the AAP statement addresses?

MS. VOGLEWEDE: Your Honor, I'm not sure where the examination is leading, but it seems to me all of these deal with legal issues, about the capacity of the parent to consent. I will object to the entire line of questioning.

THE COURT: Sustained.

Q (Mr. Baer continuing) As a pediatrician, is there a central guiding principle that you use in providing care to infants who cannot speak to you?

A Yes, you want to provide them the best care possible. You don't want to cause any unnecessary harm.

Q Are you familiar, Dr. Van Howe, with the standards of informed consent as it applies to medically indicated procedures or elective procedures or proxy consent procedures?

A Yes, I am.

Q Could you describe what the difference is between the standard for informed consent on a medically indicated versus a nonmedically indicated procedure?

MS. VOGLEWEDE: Your Honor, I will object to the form of the question. If he's asking about accepted medical practice as opposed to legal standard, I have no objection. If he's asking for the legal standard, I object on the grounds stated earlier.

THE COURT: What are you asking?

MR. BAER: I'm asking for the accepted medical practice between those.

THE COURT: Okay. Objection is overruled. You may answer.

[¶ 14] Later, Flatt called Dr. Robert Montgomery, a medical director at Meritcare, as an adverse witness for cross-examination. Dr. Montgomery was involved with reviewing complaints by Anita and James Flatt. The defense objected to Flatt's questions about the standard of care for pediatric physicians, arguing Dr. Montgomery had not been disclosed as an expert witness and his involvement in the case had been in his capacity as a medical director to review treatment concerns raised by Anita Flatt. In the context of precluding Dr. Robert Montgomery from testifying about the standard of care for informed consent for a pediatric patient, the court explained:

THE COURT: What I'm trying to convey—and perhaps I'm not very clear— that the elements of a claim for failure to obtain informed consent are legal elements, they're in the law, and those are the elements that the Court gives to the jury. That comes from me and not anybody else.

If you want to have someone testify about those elements and what it means to give informed consent, what it means—what you should disclose in a case such as this, then you have to have expert testimony to do that. If you want to inquire of Dr. Montgomery how he reached those conclusions in the let-

ter, then you can do that. But that's not what you were doing. You were asking him what is the—what is a pediatrician required to tell a patient to get informed consent, or something to that effect. You see, that's invading the province of the Court and the jury.

MR. BAER: I would like to explore that and—

THE COURT: I'm not going to change my ruling. I have ruled this—I have ruled this way many times.

MR. BAER: Judge, I don't mean to even imply that you should change your ruling. I just want to understand where my limitations are. And as I understand the law under *Jaskoviak* and *Winkjer v. Herr*, in order for the plaintiff to even come into court to sustain a claim of lack of informed consent, I need to have expert witness testimony to establish what that standard of care is that's required. So I have the burden of proving what the standard of care is from the medical side of it.

I'm not trying to invade the Court's province of giving the elements from a legal basis of an informed consent claim. All I'm trying to do is establish through my witnesses what that standard of conduct is for physicians in the pediatric practice. And we have had testimony that—and I think Dr. Kantak in her deposition even says that the AAP policy statements do provide essentially the standard of care.

And so I just want to make sure that the record is clear that what I am trying to do is to meet my burden; and, that is, to prove what the standard of care is for physicians, AAP members, in the care and treatment of infants. And that may be something totally different than the legal requirement for an informed consent case, but that's the Court's province.

But from a plaintiff's standpoint, I need to be able to prove what that standard of care is, because one of the instructions that the Court is going to have for the jury at the end is, Did the plaintiff prove the standard of care, No. 1, and, No. 2, was it breached? So that is my burden. And I'm not meaning to invade the province of the Court at all, nor get into the law aspect of it. I'm simply trying to establish what that standard of care is.

THE COURT: Ms. Voglewede.

MS. VOGLEWEDE: Your Honor, that is the role of expert testimony, and Mr. Baer had the opportunity to disclose experts to address those issues. Dr. Montgomery was not one of those people. Furthermore, there's no indication in this case that Dr. Montgomery was even asked to address that concern or that that was a concern that Anita Flatt had about informed consent. So it's clearly beyond his role in this case.

THE COURT: Well, what I will allow you to do, Mr. Baer, is to cross-examine Dr. Montgomery on those—is it one or two letters? Two letters?

MR. BAER: Two letters.

THE COURT: Okay. And to get into that because they are in evidence. But you have not disclosed him as an expert witness. So my objections to your asking him about the standard of care with informed consent with a pediatric patient are sustained. I am not going to change that ruling.

■ [¶ 15] We review a trial court's ruling on evidentiary issues pertaining to expert testimony under the abuse-of-discretion standard. *Rittenour v. Gibson*, 2003 ND 14, ¶ 29, 656 N.W.2d 691. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when its decision is not

the product of a rational mental process. *Anderson v. A.P.I. Co.*, 1997 ND 6, ¶ 18, 559 N.W.2d 204.

[¶ 16] Here, in response to Flatt's direct examination of Dr. Cold about a physician's "duty" or "obligation," the trial court stated it understood the questions to address "what the law says" physicians have to tell patients. Although perhaps inartfully stated, the court's decision did not preclude Flatt from introducing evidence about the accepted medical practice for a physician in obtaining informed consent. Rather, the court precluded Flatt from eliciting testimony about what the court perceived as the legal standard of informed consent. The court explained the jury could assume Flatt's questions were asking about a legal standard even though he did not say legal standard or duty, which the court concluded would invade the province of the court to instruct the jury on the law. This record further reflects Flatt ultimately introduced expert testimony from Dr. Cold and Dr. Van Howe about their opinions on the medical standard of care for a physician's duty of disclosure of all known risks under these circumstances and on the risks and benefits of circumcision. Although some of the court's statements during an objection to Dr. Montgomery's testimony may suggest the court sustained objections to questions about the acceptable medical standard of care as opposed to the legal standard for informed consent, those statements were in the context of the court's ruling that Dr. Montgomery had not been disclosed as an expert and therefore was precluded from testifying about a physician's standard of care. The court's explanation of its ruling, as a whole, did not preclude Flatt from introducing expert testimony about the accepted medical practice for obtaining informed consent. Under these circumstances, we conclude the trial court did not abuse its discretion in ruling on the admission of Flatt's experts' testimony.

III

[¶ 17] Flatt argues the trial court erroneously excluded relevant, non-prejudicial evidence, including circumcision tools, a circumstraint, photos of an intact penis, minutes of hospital and clinic committee meetings, and videotapes showing different circumcision procedures. He also argues the trial court denied him the opportunity to cross examine expert witnesses.

[¶ 18] Under N.D.R.Ev. 103(a), error may not be predicated on a ruling that excludes evidence unless a substantial right of the party is affected. Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. N.D.R.Ev. 402. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. N.D.R.Ev. 401. Under N.D.R.Ev. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Rule 403, N.D.R.Ev., vests the trial court with discretion to control the introduction of evidence, and we review a trial court's decision on the admissibility of evidence to determine whether the court abused its discretion. *Williston Farm Equip., Inc. v. Steiger Tractor, Inc.*, 504 N.W.2d 545, 548–49 (N.D.1993). A court abuses its discretion when it acts in an arbitrary, unreasonable, or capricious manner, or misinterprets or misapplies the law. *Anderson,* 1997 ND 6, ¶ 18, 559 N.W.2d 204.

## A

[¶ 19] The trial court excluded videotapes describing commonly used circumcision procedures, concluding their probative value was substantially outweighed by a danger of confusion of the issues or misleading the jury. The court also excluded a number of surgical instruments, surgical equipment, and photographs of an intact penis, concluding they were not relevant and would be a waste of time. Flatt argues the exhibits would have provided information that reasonable parents would want to know before deciding whether or not to circumcise their child. We agree with the trial court that those exhibits were not necessarily probative of the risks and benefits for circumcision in an informed consent case, and we conclude the court's exclusion of those exhibits was not arbitrary, capricious, or unreasonable, and was not a misapplication or misinterpretation of the law. We therefore conclude the court did not abuse its discretion in excluding those exhibits.

## B

[¶ 20] The trial court excluded meeting minutes of hospital and clinic committees, which Flatt claims dealt directly with Meritcare's development of the booklet entitled "Should Your Infant Boy Be Circumcised?" Flatt claims those minutes do not reflect authorization to distribute the booklet and are relevant to whether Meritcare had a booklet on circumcision when Josiah Flatt was born in March 1997. He argues the court erred in excluding evidence about the development of the booklet to show a lack of informed consent. The booklet stated an initial publication date of December 1996, and a revised publication date of January 1997. The trial court concluded the minutes were cumulative evidence about when the booklet was published. Flatt has not cited any reference in the proffered minutes to dispute the publication date, or the availability of the booklet for distribution. We conclude the trial court's exclusion of those minutes was not arbitrary, capricious, or unreasonable, and was not an abuse of discretion.

## C

[¶ 21] Flatt argues the trial court erred in permitting Dr. Theodore Sawchuk to testify about whether or not Josiah Flatt would need further surgery and whether or not he was injured as a result of the circumcision. Flatt claims the court erred in allowing Dr. Sawchuk to offer expert opinion testimony that was not previously disclosed. However, Dr. Sawchuk was a physician who saw Josiah Flatt as a result of Anita Flatt's post-surgery complaints to Meritcare, and Dr. Sawchuk testified as a treating physician. Under N.D.R.Ev. 701, witnesses are permitted to give testimony in the form of opinions or inferences that are rationally based on the perceptions of the witness and helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. Dr. Sawchuk testified regarding his examination of Josiah Flatt and his findings and recommendations in August 1997. Dr. Sawchuk's opinion that he did not consider Josiah Flatt to have an injury from the circumcision and would not need any surgery in the future was opinion testimony within the scope of his care as a treating physician. We conclude the trial court did not abuse its discretion in admitting Dr. Sawchuk's testimony.

## D

[¶ 22] Flatt argues the trial court erred in limiting his examination of Dr. Robert Montgomery. When a motion for a new trial is made to the trial court, the movant is limited on appeal to a review of the grounds presented to the trial court. *Andrews v. O'Hearn*, 387 N.W.2d 716, 728

(N.D.1986). Flatt did not raise this issue in his motion for a new trial, and he is precluded from raising this issue on appeal.

## IV

[¶ 23] Flatt argues the jury instructions, as a whole, were misleading and prejudicial. Jury instructions must fairly and adequately inform the jury of the applicable law. *Huber v. Oliver County*, 1999 ND 220, ¶ 10, 602 N.W.2d 710. Although a party is entitled to instructions which present that party's theory of the case, a trial court is not required to instruct the jury in the exact language sought by that party if the court's instructions correctly and adequately inform the jury of the applicable law. *Olson v. Griggs County*, 491 N.W.2d 725, 729 (N.D.1992); *Wasem v. Laskowski*, 274 N.W.2d 219, 226 (N.D.1979). On appeal, we review jury instructions as a whole, and if they correctly advise the jury of the law, they are sufficient although parts of them, standing alone, may be erroneous and insufficient. *Olson*, at 729.

### A

[¶ 24] Flatt argues the court's instruction about a physician's duty of disclosure erroneously blended the reasonable patient standard and the professional standard. Relying on language in *Jaskoviak*, 2002 ND 1, ¶ 16, 638 N.W.2d 1, he argues the court's instructions on the physician's duty to disclose were directly contrary to the reasonable patient standard, which he claims requires that "all risks potentially affecting the decision must be unmasked." However, as we have previously said, Flatt's reliance on isolated language in *Jaskoviak* is misplaced because that decision requires disclosure of material risks, not all risks. *See also Koapke*, 2003 ND

64, ¶ 15, 660 N.W.2d 206; *Winkjer*, 277 N.W.2d at 588.

[¶ 25] Flatt's requested instruction on a physician's duty of disclosure provided:

A physician has a duty to disclose to the patient the available treatment alternatives, including no treatment, and the material and known risks potentially involved in each alternative. A patient's right of self-determination in a particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves. A physician has a duty to disclose to the patient the available treatment alternatives, including no treatment, and the material and known risks potentially involved in each alternative. The test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked. A duty to disclose can arise only if the physician knew or should have known of the risks to be disclosed. A physician has no duty to disclose all possible risks and dangers of the proposed treatment but only those that are significant in terms of their seriousness and likelihood of occurrence. It is for you the jury to determine whether a risk is the type of harm which a reasonable patient would consider in deciding on consenting to medical treatment.

[¶ 26] The trial court instructed the jury on a physician's duty of disclosure:

A physician has a duty to disclose to the patient, or in the case of a child, to his parent, the available alternatives and the material and known risks potentially involved in each alternative. A duty to disclose can arise only if the physician knew or should have known of the risk to be disclosed. A physician is not required to inform a patient of risks that

are so remote as to be negligible even where the consequences may be severe, and is not required to inform the patient of a very minor consequence even though the probability is high. A physician has no duty to disclose all possible risks and dangers of the proposed procedure but only those that are significant in terms of their seriousness and likelihood of occurrence. A doctor should not be required to give a patient a detailed technical, medical explanation that in all probability the patient would not understand. There is no need to disclose risks of little consequence, those that are extremely remote, or those that are common knowledge as inherent in the treatment.

The trial court also instructed the jury:

> Disclosure to a patient which would be made by doctors of good standing, under the same or similar circumstances, is relevant and material to the determination of whether the doctor has fulfilled the duty to disclose.
>
> . . . .
>
> A risk is material if a reasonable patient would attach significance to the specific risk. Significance is based on the existence and nature of the risk and the probability of its occurrence.

[¶ 27] Flatt cannot complain about language in the court's instructions which tracked language in his requested instruction. Moreover, contrary to Flatt's claim, the court's instructions on the duty of disclosure did not relate a physician's duty of disclosure to the custom of physicians practicing in the community. Rather, the court's instructions effectively tracked language about materiality from our decisions in *Koapke*, 2003 ND 64, ¶¶ 14–15, 660 N.W.2d 206, *Jaskoviak*, 2002 ND 1, ¶¶ 17–18, 638 N.W.2d 1, and *Winkjer*, 277 N.W.2d at 587–89. *See also Wasem*, 274 N.W.2d at 226. Under *Jaskoviak*, and

*Winkjer*, a physician is required to disclose material risks, not all risks. The court's instructions further defined materiality based on whether the risk was the type which a reasonable patient would consider in deciding on medical treatment. Under these circumstances, we reject Flatt's claim the instructions erroneously blended the subjective and objective standards for disclosure. Although we agree the reasonable patient standard is the appropriate standard, we conclude the trial court was not required to instruct the jury in the language sought by Flatt.

B

[¶ 28] Flatt argues the instructions erroneously told the jury "there is no claim for you to consider that the procedure was done wrong or that Dr. Kantak was negligent in performing the circumcision procedure." He argues the instruction is directly contrary to significant medical testimony indicating that undisclosed risks of adhesions and asymmetry were the cause of Flatt's complaints. However, Flatt's complaint did not allege the actual circumcision procedure was improperly or negligently performed, his proposed jury instructions did not include an allegation the procedure was improperly or negligently performed, and he has cited no expert testimony in this record to establish the medical standard of care for performing a circumcision.

C

[¶ 29] Flatt argues the trial court erred in not instructing the jury in language tracking N.D.C.C. § 23–12–13, which authorizes parents to consent to health care for their minor children. That statute requires the parent to determine, in good faith, that the minor would have consented to the proposed health care, and if such a determination cannot be made,

the decision to consent to the proposed health care may be made only after determining the proposed health care is in the minor's best interest. Flatt argues "[a] parent who, without adequate information, makes a decision to allow a medical doctor to surgically amputate the most erogenous tissue of the male body for no therapeutic reason, could be viewed to be acting contrary to the best interests of the child."

[¶ 30] Flatt's proposed instruction provided:

It is the law in the State of North Dakota that before a medical doctor may treat a minor patient, the medical doctor must obtain informed consent. Before a parent is authorized to provide informed consent, she must first determine in good faith that the patient, if not incapacitated, would consent to the proposed health care. If such a determination can be made, the decision to consent to the proposed health care may be made only after determining that the proposed health care is in the patient's best interests.

[¶ 31] We believe Flatt's proposed instruction addresses issues about Anita Flatt's fault, and the jury did not reach that issue because it determined Dr. Kantak was not negligent. We conclude any claimed error in the court's failure to give that instruction was harmless.

## D

[¶ 32] Flatt argues the court erred in submitting a special verdict form with a question about Anita Flatt's comparative fault. The jury did not address Anita Flatt's fault because it determined Dr. Kantak was not negligent, and we conclude any claimed error in the special verdict form was harmless.

## V

[¶ 33] Flatt argues the cumulative effect of the multiple errors deprived him of the substance of a fair trial. Flatt did not raise this issue in his motion for a new trial, and he is precluded from raising this issue on appeal. *See Andrews*, 387 N.W.2d at 728.

## VI

[¶ 34] Flatt argues the trial court abused its discretion in taxing costs in favor of Dr. Kantak and Meritcare. Flatt argues the notice of entry of judgment in this case did not include the statement of costs and disbursements as an attachment as required by N.D.R.Civ.P. 54(e), which provides that "[a] copy of the [verified] statement [of costs and disbursements] must accompany the notice of entry of judgment." Dr. Kantak and Meritcare served Flatt with a verified statement of costs and disbursements of $64,580.57 almost a month before the notice of entry of judgment was served, and Flatt had notice of the costs claimed by Dr. Kantak and Meritcare. Although Dr. Kantak and Meritcare subsequently offered to serve both documents together, the trial court did not require them to do so, and under these circumstances, we reject Flatt's claim that all costs should be denied for that reason.

[¶ 35] Flatt had notice of the statement of costs and disbursements and objected to costs and disbursements. After a hearing, the court reduced the award of costs and disbursements to $58,506.20. A trial court's decision on fees and costs under N.D.C.C. § 28–26–06 will not be reversed on appeal unless an abuse of discretion is shown. *Patterson v. Hutchens*, 529 N.W.2d 561, 567 (N.D.1995). We conclude the trial court did not abuse its discretion in its award of costs and disbursements to Dr. Kantak and Meritcare.

## VII

[¶ 36] Flatt argues the trial court erred in concluding he did not have standing to bring an equal protection challenge to N.D.C.C. § 12.1–36–01, the female genital mutilation law. The trial court concluded Flatt did not suffer an injury in fact and lacked standing to challenge the constitutionality of that statute. Flatt argues he has standing to challenge the statute under the equal protection provisions of the federal and state constitutions because he has suffered an injury. Flatt's argument is that his parents should have been prohibited from consenting to the circumcision. This is not an argument recognized under the equal protection clauses.

[¶ 37] Section 12.1–36–01, N.D.C.C., which criminalizes surgical alteration of female genitalia but not male genitalia, provides:

1. Except as provided in subsection 2, any person who knowingly separates or surgically alters normal, healthy, functioning genital tissue of a female minor is guilty of a class C felony.

2. A surgical operation is not a violation of this section if a licensed medical practitioner performs the operation to correct an anatomical abnormality or to remove diseased tissue that is an immediate threat to the health of the female minor. In applying this subsection, any belief that the operation is required as a matter of custom, ritual, or standard of practice may not be taken into consideration.

[¶ 38] The existence of standing is a question of law, which we review de novo. *Nodak Mut. Ins. Co. v. Ward County Farm Bureau*, 2004 ND 60, ¶ 12, 676 N.W.2d 752. In *State v. Carpenter*, 301 N.W.2d 106, 107 (N.D.1980), we said:

The question of standing focuses upon whether the litigant is entitled to have the court decide the merits of the dispute. It is founded in concern about the proper—and properly limited—role of the courts in a democratic society. See *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 [1974]. Without the limitation of the standing requirements, the courts would be called upon to decide purely abstract questions. As an aspect of justiciability, the standing requirement focuses upon whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The inquiry is twofold. First, the plaintiff must have suffered some threatened or actual injury resulting from the putatively illegal action. *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Secondly, the asserted harm must not be a generalized grievance shared by all or a large class of citizens; the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties.

[¶ 39] Flatt's reliance on *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) and *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979), to support his under-inclusive challenge to N.D.C.C. § 12.1–36–01 is misplaced. In *Orr*, at 270–71, 99 S.Ct. 1102 a former husband objected to paying his ex-wife alimony and challenged Alabama statutes that required husbands, but not wives, to pay alimony upon divorce. The United States Supreme Court rejected the argument "that the only 'proper plaintiff' would be a husband who requested alimony for himself, and not one who merely objected to paying alimony."

*Id.* at 272–73, 99 S.Ct. 1102. The Court concluded the former husband bore a burden he would not bear if he were a female, because the state law imposed an alimony obligation on him and his alimony obligation was sufficient to establish standing. *Id.* at 273, 99 S.Ct. 1102.

[¶ 40] In *Ragland,* 481 U.S. at 223–25, 107 S.Ct. 1722 the publisher of a general interest magazine made a First Amendment challenge to an Arkansas sales tax that exempted proceeds derived from the sale of newspapers, and religious, professional, trade, and sports journals. The United States Supreme Court rejected the Tax Commissioner's argument that the publisher failed to assert an injury that could be addressed by a favorable court decision, concluding the publisher had standing to claim that others similarly situated were exempt from a state law that required the publisher to pay a tax. *Id.* at 227, 107 S.Ct. 1722. The Court said the publisher's " 'constitutional attack holds the only promise of escape from the burden that derives from the challenged stat[e].' " *Id.* (quoting *Orr,* 440 U.S. at 273, 99 S.Ct. 1102).

[¶ 41] In both *Orr* and *Ragland,* the challenged statutes imposed obligations on the challengers either to pay alimony or a tax. In *Linda R.S. v. Richard D.,* 410 U.S. 614, 615, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the mother of an illegitimate child challenged the constitutionality of a Texas criminal statute that subjected any parents who failed to support their children to prosecution. The Texas courts had construed the statute to apply solely to parents of legitimate children and not to parents of illegitimate children, and the Texas prosecuting attorney had refused to prosecute the alleged father of the mother's illegitimate child. *Id.* at 615–16, 93 S.Ct. 1146. The United States Supreme Court said the mother had suffered an injury from the alleged father's failure to pay support. *Id.* at 618, 410 U.S. 614. The Court concluded, however, that abstract injury was not sufficient to establish standing, because parties who invoke judicial power must show they have sustained, or are in immediate danger of sustaining, some direct injury as a result of a statute's enforcement. *Id.* at 618, 93 S.Ct. 1146. The Court concluded the mother did not have standing because she had not shown her failure to secure support resulted from the nonenforcement of the statute. *Id.*

[¶ 42] We conclude Flatt has not alleged an injury traceable to N.D.C.C. § 12.1–36–01. Although N.D.C.C. § 12.1–36–01 may benefit female minors, it does not impose an obligation on Flatt. The statute does not restrict Flatt's right to make medical decisions and has not imposed any burdens or obligations on him. A decision by a parent or guardian to have a minor boy circumcised is not controlled by that statute. Although the statute may prohibit minor females from having their genital tissue surgically altered, the statute has not burdened or injured Flatt in the sense that would confer standing on him. Flatt was circumcised because, through Anita Flatt, he consented to the procedure, and he has not demonstrated his circumcision resulted from the statute. We conclude Flatt lacks standing to challenge the constitutionality of N.D.C.C. § 12.1–36–01.

## VIII

[¶ 43] Because we have concluded the trial court committed no reversible error in the proceedings leading up to the judgment, we also conclude the court did not abuse its discretion in denying Flatt's motion for a new trial. *See Ali by Ali v. Dakota Clinic, Ltd.,* 1998 ND 145, ¶ 5, 582 N.W.2d 653.

## IX

[¶ 44] We affirm the judgment and the order denying Flatt's motion for a new trial.

[¶ 45] WILLIAM A. NEUMANN and MARY MUEHLEN MARING, JJ., and EVERETT NELS OLSON, S.J.

[¶ 46] The Honorable EVERETT NELS OLSON, Surrogate Judge, sitting in place of KAPSNER, J., disqualified.

SANDSTROM, Justice, concurring specially.

[¶ 47] The patient or parents must be clearly informed of factual information about the medical procedure and its short-term and long-term consequences that might reasonably result in a patient's or parent's electing not to have the procedure performed. *Koapke v. Herfendal*, 2003 ND 64, ¶¶ 14, 15, 660 N.W.2d 206; *Jaskoviak v. Gruver*, 2002 ND 1, ¶¶ 13, 14, 638 N.W.2d 1; *Bartal v. Brower*, 268 Kan. 195, 993 P.2d 629, 634 (1999); N.D.C.C. § 23–12–13(1)(e). I understand the majority to agree with this proposition, and I concur in it.

[¶ 48] Although the trial court is afforded wide discretion in deciding whether to admit or exclude evidence, *Brandt v. Milbrath*, 2002 ND 117, ¶ 13, 647 N.W.2d 674, I remain concerned that the cumulative effect of the trial court's decision limiting the plaintiffs' evidence may have denied them a fair trial, *see Kingdon v. Sybrant*, 158 N.W.2d 863, 869 (N.D. 1968), but I cannot say that my concern rises to a conviction that a new trial need be ordered.

[¶ 49] DALE V. SANDSTROM, J.